1997 SD 134

**Calvin Earle SPRIK, Petitioner and Appellant,**

**v.**

**Joe CLASS, acting in his capacity as the duly appointed Warden of the South Dakota State Penitentiary, Appellee.**

No. 19722.

Supreme Court of South Dakota.

Argued March 24, 1997.

Decided Dec. 17, 1997.

Kenneth R. Dewell of Viken, Viken, Pechota, Leach & Dewell, LLP, Rapid City, for petitioner and appellant.

Mark Barnett, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, for appellee.

RUSCH, Circuit Judge.

[¶ 1.] Calvin Earle Sprik (Sprik) appeals from the denial of his application for a writ of habeas corpus. We affirm.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] At trial, Sprik was convicted of one count of third degree (statutory) rape. He was acquitted of two counts of third degree rape and three counts of second degree (forcible) rape. His conviction was affirmed on direct appeal in *State v. Sprik,* 520 N.W.2d 595 (S.D.1994). Sprik then applied for a writ of habeas corpus which was denied by Judge Merton Tice following hearings on January 6, 9, 17 and 23, and February 6, 1995, and a motion for reconsideration which was heard on September 14, 1995.

[¶ 3.] The factual background of the charges against Sprik is set out in the South Dakota Supreme Court opinion on the direct appeal. However, because of the issues raised in this appeal a further discussion of the times involved is necessary. It was between 9:30 and 10:30 on the evening of September 14, 1992, when thirteen-year-old N.G. went to Hardee's on Fifth Street in Rapid City. After she had been at Hardee's for some time, N.G. went to Memorial Park where the rape occurred. The Park is several blocks north of Hardee's. Later that night, N.G. told the police that she left Hardee's at 10:45 p.m. but she told Dr. Charles Hart at Rapid City Regional Hospital that she left Hardee's at 11:30 p.m. At the trial she testified that she went to Hardee's at 9:30 p.m. or 10:00 p.m. and that she stayed at Hardee's until about 10:00 p.m.

[¶ 4.] In his various briefs, Sprik argues that "if N.G. is to be believed" the rape occurred over a three to three and one half hour period from 10:30 or 11:00 p.m. until 2:00 a.m. and that N.G. was "adamant" that the rape took three or three and one half hours. However, on the night of the rape, N.G. consistently reported that it took about two hours. At trial, she testified that she had no idea how long the rape took as she was not looking at the time. Although Sprik relies upon statements made by N.G. during cross-examination, in support of his claim that the rape took three to three and one half hours, it appears from her testimony that she did not know how long the rape took and was merely guessing as to its length.[1] It is also unclear whether the times she referred to are the times of the rape or of the entire incident which began at Hardee's earlier in the evening.

[¶ 5.] Early the next morning on the south side of Memorial Park, N.G. flagged down a car, told the driver that she had been raped, gave a partial description of the perpetrator and asked to be taken home. N.G. actually had the driver take her to the home of a boyfriend. However, within a couple of blocks after leaving N.G., the driver saw police officers Michael Speer and Brionne Shegstad and reported the incident to them. Speer and Shegstad immediately put out a radio message about the rape which was recorded at 2:08 a.m. Based upon the times which elapsed from the time N.G. was picked up on Omaha Street, the rape ended about 1:30 a.m.

[¶ 6.] When they initially talked to N.G., Officers Speer and Shegstad obtained a statement from her including a detailed description of her assailant. N.G. described her assailant to the police officers as thirties, short dark hair, blue jeans, blue and white shirt, fanny pack, Harley Davidson hat, scratch on his ear and carrying a green backpack or bag. The description given by N.G. was broadcast on the police radio and Officer James, who was on patrol in the downtown Rapid City area at the time, responded that he had seen an individual with a green backpack just minutes before, pro-

---

1. On cross-examination she testified:

> Q. N___, this whole incident out there in the park, to the best of your recollection, how long did it take?
> A. I'm not sure. I know I got to my boyfriend's around 1:30. I don't know. Something like that, so I don't know exactly.
> Q. Do you recall guessing when the police asked you? Do you remember?
> A. I said the same thing I'm saying now. Around 1:30. Something like that. Around 1:30, 2:00 o'clock. Something like that.
> Q. Roughly around two hours?
> A. Ten to 1:00, whenever.
> Q. Ten to 1:00?
> A. 1:30. I know when I got to my boyfriend's house, it was past 1:00.
> Q. Do you realize that from 10:00 o'clock to 1:30 is three and a half hours?
> A. Yes.
> Q. You are saying that this was going on for that long of a time?
> A. It must have because I didn't get home until then, until 3:00.

ceeding south away from the area of Memorial Park. He immediately began a search for the individual he had seen.

[¶ 7.] Sprik claims that the description initially given to the police by N.G. was materially different from his actual appearance and that her description was tainted by many subsequent events. He claims repeatedly that when N.G. was picked up by the driver that she "made no mention of any backpack" but the driver specifically testified that N.G. told her of the backpack.

[¶ 8.] Sprik also repeatedly claims that "Officer James . . . disclosed during his habeas testimony that he did not feel that the description of the alleged assailant which was being broadcast . . . matched Sprik because Sprik had a red coat, medium length hair with no beard, whereas the reports were of 'very short, dark hair with a beard.'" However, no fair reading of Officer James' testimony supports Sprik's claim that James was of the opinion that the broadcast description did not match Sprik.

[¶ 9.] Sprik also repeatedly claims that N.G.'s description of the shirt her assailant was wearing did not match what he had on because she described a blue or blue and white shirt while he was wearing a red, white and blue shirt. The mug shots taken that night show that Sprik was wearing a blue and white plaid shirt that had some very fine red lines but that the shirt was predominately blue. The red lines are so small as to be virtually unnoticeable on the mug shots.

[¶ 10.] Sprik also claims that he had a very obvious 6 or 7-inch scar and that N.G.'s failure to mention the scar shows that her identification was not credible. However, the scar is not noticeable on the mug shots and Officer James, who saw Sprik that night, did not notice it.[2] The police reports also show that N.G. described her assailant as having a "scratch." Although there was a discrepancy as to whether Sprik had a beard

at that time, the mug shots show that he had several days growth of whiskers. Some observers may characterize what is shown on the mug shots as a beard while others may not. N.G.'s description of her assailant was highly accurate, and included the blue and white shirt, blue jeans, green backpack, Harley Davidson hat, fanny pack, and scratch on his left cheek.[3]

[¶ 11.] Officer James initially stopped Sprik about 2:00 a.m.[4] He estimated that he heard the radio broadcast about the possible rape five or six minutes later. This is consistent with Officers Speer and Shegstad's radio broadcast at 2:08. Officer James immediately began searching for the person whom he had stopped just minutes earlier.

[¶ 12.] After talking briefly to N.G., Officers Speer and Shegstad took her across the alley to her home where they talked to her mother. Then they took her to Hardee's because she told them that her assailant had been there earlier and that his friend might still be there. Finding no one at Hardee's who could identify the assailant, Officer Speer then left to go to the west side of Rapid City to contact other witnesses who had been at Hardee's earlier that evening, while Officer Shegstad took N.G. to Memorial Park to look for the scene of the rape.

[¶ 13.] On the way to Memorial Park, N.G. showed Officer Shegstad the alley behind the Firehouse Brewery where her assailant had told her that he slept. Hearing that information over the radio, Officer Speer (who was looking for the other potential witnesses on the west side of town at the time) told the officers involved in the search that several days earlier he had received a complaint about a transient who was sleeping on the roof of the Firehouse Brewery. Officer James then went to that location and found Sprik. N.G. was brought back from Memorial Park (a distance of only a couple of blocks)

---

2. Although Sprik claims that Officer James saw the scar, the record shows that James did not observe it during his contact with Sprik that night. The only time that James saw the scar was when his attention was drawn to it in the bright light of the courtroom.

3. Although there was no testimony about finding a fanny pack, the police evidence inventory corroborates her claim and shows that Sprik had 1 black waste [sic] pouch.

4. The NCIC printout shows that the police department was notified that there were no outstanding warrants on Sprik at 2:01:53.

by Officer Shegstad and identified Sprik at a "show-up" conducted in the alley behind the Brewery.

[¶ 14.] Officer James estimated that it was about twenty minutes after his initial contact with Sprik that he received the information about the Firehouse Brewery. He went directly to that location and located Sprik. He also estimated that it was twenty-five minutes after his first contact with Sprik when he found him. It was about 2:25 a.m. when Sprik was located at the Firehouse Brewery. Officer James testified that Officer Shegstad brought N.G. to that location for the "show-up" within five minutes which would have been about 2:30. This was one hour after the rape concluded and one half hour after Officer James first saw Sprik.

[¶ 15.] Sprik claims that N.G. never told the investigating officers that her assailant lived under the staircase at the Firehouse Brewery. He claims that this information came from Officer Speer based upon the earlier complaint which he had received about someone sleeping there. However, the police reports and testimony clearly show that Officer Shegstad received the information about the alley behind the Firehouse Brewery from N.G. and that Officer Speer then added the information about the rooftop location based upon the earlier complaint which he had received.

[¶ 16.] Sprik claims that Officer James agreed that the time lapse between the identification and the first time he saw Sprik was more like 1–1/2 hours rather than the twenty-five minutes he testified to at trial. However, the record shows that Officer James never "agreed" that the time lapse was 1–1/2 hours. Sprik's attorney was the only one who said that.

[¶ 17.] Sprik also claims that Officer James further admitted that during the approximately 20–30 minutes that Sprik was in his custody awaiting the drive-by identification that Sprik denied having had any sexual relationship with any woman that night. HCTT, 1/6/95, p. 10 and 26–27. However,

there is nothing in the habeas transcript to support this claim, and other testimony in that transcript is contrary to Sprik's claim that he was in custody for 20–30 minutes awaiting the show-up.[5] Sprik also claims that trial counsel failed to interview Officer James prior to trial, but trial counsel specifically testified that he talked to Officer James before trial.

### DECISION

[¶ 18.] In this appeal, Sprik contends: 1) the State should not have been allowed to assert multiplicious and duplicitous alternating charges of rape and statutory rape; and 2) ineffective assistance of counsel.

I. Multiplicious and Duplicitous Charges

[¶ 19.] Sprik claims that the State should not have been allowed to file an information which charged him with alternative charges of rape and statutory rape. He admits that this issue was considered by this Court on direct appeal, but he claims that this Court failed to "properly consider" his rights.

[¶ 20.] A review of the opinion from the direct appeal indicates that these issues were fully and fairly considered by the Court at that time. It has long been settled law in South Dakota that issues which were raised in a direct appeal are res judicata on a writ of habeas corpus. *Scott v. Class,* 532 NW2d 399, 402 (S.D.1995); *Loop v. Class,* 1996 SD 107, ¶ 24, 554 N.W.2d 189, 193; *Lodermeier v. Class,* 1996 SD 134 ¶ 23, 555 N.W.2d 618, 626; *St. Cloud v. Leapley,* 521 N.W.2d 118, 129 (S.D.1994); *Cowell v. Leapley,* 458 N.W.2d 514, 520 (S.D.1990). We have held that

> Where substantially the same issue was raised on direct appeal as in habeas review, 'the principle of res judicata is applicable to proceedings upon habeas corpus.'

*Stumes v. Delano,* 508 N.W.2d 366, 370 (S.D.1993)(quoting *Miller v. Leapley,* 472 N.W.2d 517, 519 (S.D.1991)).

---

5. Q. Officer, how long were you and Mr. Sprik and the other officer down in the alleyway awaiting Officer Shegstad to bring N.G. to that location?

A. It was probably within a few minutes.

## II. Ineffective Assistance of Counsel

■ [¶ 21.] Ineffective assistance of counsel is a mixed question of fact and law upon which this Court can substitute its own judgment as to whether counsel's representation was ineffective. *See St. Cloud; Aliberti v. Solem,* 428 N.W.2d 638, 640 (S.D.1988); *Lykken v. Class,* 1997 SD 29 ¶ 6, 561 N.W.2d 302, 304.

[¶ 22.] In determining whether a defendant suffered from ineffective assistance of counsel, this Court has adopted the two prong test from *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Those two prongs are 1) whether trial counsel made errors that were so serious that he was not functioning as counsel and 2) whether those errors seriously prejudiced the defendant to the extent that they deprived him of a fair trial.

> To establish ineffective assistance of counsel, a defendant must prove (1) that counsel's representation fell below an objective standard of reasonableness and (2) that such deficiency prejudiced him. Relying on *Strickland, Woods v. Solem,* 405 N.W.2d 59, 61 (S.D.1987) held that prejudice exists when there is a reasonable probability that, but for counsel's unprofessional errors, the proceeding would have been different. It is not enough for the petitioner to show that the verdict would have been different, he must show 'that the counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose results is reliable'. (citations omitted).

*Fast Horse v. Leapley,* 521 N.W.2d 102, 104 (S.D.1994). *See also Luna v. Solem,* 411 N.W.2d 656, 658 (S.D.1987); *Mitchell v. Class,* 524 N.W.2d 860 (S.D.1994).

■ [¶ 23.] Effective assistance of counsel is not equated with a successful result. *Jenner v. Leapley,* 521 N.W.2d 422, 425 (S.D. 1994); *State v. McBride,* 296 N.W.2d 551, 554 (S.D.1980). This Court presumes that an attorney is competent until a showing to the contrary is made, so a petitioner, who is alleging ineffective assistance of counsel, carries a heavy burden. *Lykken,* 1997 SD at ¶ 20, 561 N.W.2d at 307; *Jenner, supra;*

*State v. Walker,* 287 N.W.2d 705, 706 (S.D. 1980).

> Further, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance'" and "'[t]he reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances and the standard of review is highly deferential.'" The petitioner must overcome the presumption that, under the circumstances, the challenged action "'might be considered sound trial strategy.'" (citations omitted).

*Phyle v. Leapley,* 491 N.W.2d 429, 433 (S.D. 1992).

■ [¶ 24] In reviewing trial counsel's performance it is not this Court's function to second guess the decisions of experienced trial attorneys regarding matters of trial tactics unless the record shows that counsel failed to investigate and consider possible defenses and to exercise their good faith judgment thereon. *Fast Horse,* 521 N.W.2d at 106; *Roden v. Solem,* 431 N.W.2d 665, 667 (S.D.1988); *Walker,* 287 N.W.2d at 707; *Crowe v. State,* 86 S.D. 264, 194 N.W.2d 234, 238 (1972).

> While this court will not compare counsel's performance to that of some idealized "super-lawyer" and will respect the integrity of counsel's decision in choosing a particular strategy, these considerations must be balanced with the need to insure that counsel's performance was within the realm of competence required of members of the profession.

*Roden,* 431 N.W.2d at 667 n. 1. The selection of a defense is a trial strategy this Court will seldom reevaluate. *Lodermeier,* 1996 SD 134 at ¶ 12, 555 N.W.2d 618; *Fast Horse,* 521 N.W.2d at 106. However, an attorney must make a reasonable investigation and must make reasonable decisions to forgo particular investigations. *In Re Application of Deserly,* 507 N.W.2d 905, 907 (S.D.1993). A difference in trial tactics does not amount to ineffective assistance of counsel. *Fast Horse, supra.* Although a strategy may appear unwise to some, it may just as easily appear

sound to others. *Myrick v. Maschner*, 799 F.2d 642, 647 (10th Cir.1986).

[¶ 25.] As part of these habeas proceedings, the trial court authorized Sprik to employ Robert Van Norman, a trial attorney from Rapid City, as an expert witness on the issue of competency of defense counsel at the original trial. Mr. Van Norman expressed an opinion that trial counsel did not function as counsel should. However, the habeas court was not bound to accept the testimony of such an expert. The testimony of an expert is to be given the weight that the fact finder determines it is entitled to, based upon the expert's qualifications and the reasonableness of the opinions expressed. *Matter of Estate of Davis*, 524 N.W.2d 125, 130 (S.D.1994); *State v. Weisenstein*, 367 N.W.2d 201, 207 (S.D.1985); *State Dept. of Transp. v. Richey Motor*, 296 N.W.2d 505 (S.D.1980).

[¶ 26.] The trial court did not accept Mr. Van Norman's opinion in this case. A review of his testimony shows a lack of familiarity with some of the facts of the case and his testimony was replete with speculative claims that trial counsel should have investigated various areas, without any knowledge as to whether those investigations would have produced helpful evidence.[6] In addition, it appears from his testimony that Van Norman was testifying to a standard of "perfect representation" that he felt trial counsel should have provided.

[¶ 27.] A trial attorney has to make decisions on the examination and cross examination of witnesses in split seconds. It is far different to sit back with a transcript and express opinions about what "ought to have been done." This Court will not act as a "Monday morning quarterback." It will not attempt to substitute its judgment for that of experienced trial counsel.[7] Its review will be limited to whether trial counsel's representa-

tion fell below an objective standard of reasonableness and whether that deficiency prejudiced the defendant to such an extent that the adversarial balance was upset to the extent that the trial was rendered unfair and the verdict suspect. *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

[¶ 28.] In this appeal, Sprik claims that trial counsel was deficient in numerous areas.

A.  Failure to Focus on an Alibi Defense

[¶ 29.] Sprik argues that trial counsel erred in failing to present an alibi defense. The essence of Sprik's alibi defense is set out in his brief where he claims:

Recalling the testimony of [the victim], her contact with Sprik occurred over a period of between 3 and 3–1/2 hours. CTT, Vol.I, p. 73. If [the victim] was to be believed by the jury, Sprik had an excellent alibi defense. Mr. White Eyes testified that he was with Sprik the entire evening at the Hall Inn Bar and then at Hardee's after which the two of them walked to Mr. White Eyes' house. His testimony was confirmed by Hardee's security officer, Ms. Million [sic]. She escorted Sprik and White Eyes out of the Hardee's door around 1:00 a.m. and watched them walk south together on Fifth Street (away from Memorial Park). CTT, Vol.II, p. 223.

[¶ 30.] Trial counsel testified during the habeas proceeding that he considered the alibi defense and made a conscious decision not to use it because he felt that it was shaky.[8] Trial counsel also testified that he felt that if he didn't have a credible alibi that he was better off not using it and that the alibi defense would not be successful in this case because it did not cover all of the time in issue.

[¶ 31.] Instead, trial counsel chose a "revenge" defense, i.e. that Sprik was with N.G.

---

6.  Those factual errors include his belief that Jerri Knapp was the manager of Hardee's when, she was actually a kitchen worker, his misunderstanding of the sequence of events and his belief that Dr. Hart took an anal swab when in fact he took a swab from the cervix.

7.  Judge Davis pointed out at the May 24, 1993, motion hearing that based upon his experience,

trial counsel was an experienced and competent trial attorney.

8.  Although this Court indicated in the direct appeal that Sprik's defense was an alibi defense, trial counsel testified at the habeas hearing that this was incorrect.

that night but refused to give her free drugs and that she fabricated the rape accusation for revenge. Trial counsel felt that the alibi defense would require the jury to believe that N.G. had made up the rape accusation against a stranger for no apparent reason, but that the revenge defense would provide a reason for her accusation and would better explain how she had obtained the information as to where Sprik lived.[9]

[¶ 32.] The selection of a defense is a trial strategy which this Court will seldom reevaluate, but an attorney must make a reasonable investigation and reasonable decisions to forgo particular defenses. In determining whether trial counsel's decision to forgo the alibi defense was reasonable, the court must look at the alibi defense which could have been provided by Ted White Eyes.

[¶ 33.] Sprik claims that trial counsel should have relied upon the alibi testimony of Ted White Eyes, which he repeatedly characterizes as an "excellent alibi." Since Sprik did not testify, the alibi was entirely dependent upon the testimony of Ted White Eyes. However, White Eyes testified that he was intoxicated throughout the evening and at trial could not identify Sprik as the person who was with him that night but did recall that this person's name was "Calvin."

[¶ 34.] White Eyes testified that he met "Calvin" downtown between 6:00 p.m. and 7:00 p.m., that they talked for ten to fifteen minutes (which would put the time no earlier than 6:10 and no later than 7:15); that they then went to White Eyes' house which was 1-1/2 blocks away, which took them ten minutes (6:20 to 7:25); that they were there for thirty to forty-five minutes (6:50 to 8:10); that they then walked to the Hall Inn Bar which took them fifteen to twenty minutes (7:05 to 8:30); that they drank there for an hour or two hours (8:05 to 10:30); that they then walked to Hardee's which took them fifteen to twenty minutes (8:20 to 10:50); that they were at Hardee's for a half hour (8:35 to 11:00); that they then left Hardee's and walked to White Eyes' house, so that "Calvin" could get his bag, which took them five minutes (8:40 to 11:05); that they were at White Eyes' house for ten to fifteen minutes (8:50 to 11:20). White Eyes testified that "Calvin" then left and he did not see him again.

[¶ 35.] If the rape started at 11:30 p.m., White Eyes didn't provide any alibi at all. Based on his longest time estimates, White Eyes was with Sprik until no later than 11:20 p.m. and last saw him just a block south of Hardee's where N.G. claims that she had her first contact with Sprik.

[¶ 36.] White Eyes' testimony also corroborates significant portions of N.G.'s testimony. White Eyes testified that he and Calvin were together at Hardee's and N.G. testified that Sprik was with another individual at Hardee's who was either Indian or Mexican.[10] White Eyes testified that while they were in Hardee's that Calvin was running around talking to other people and N.G. testified that while she was at Hardee's, Sprik came up to her and talked to her (offered her the free drugs). White Eyes also testified that Calvin left his bag at his (White Eyes') house, which was one block from Hardee's. They returned there to get the bag and spent ten to fifteen minutes there before Calvin left. N.G. testified that Sprik said the drugs were in his bag and that he left and about fifteen minutes later he was back outside Hardee's at which time she went outside and joined him.

[¶ 37.] The potential alibi provided by White Eyes ends at White Eyes' house no later than 11:20 p.m. (and perhaps as early as 8:50), and the incident between Sprik and N.G. begins one block away as late as 11:30 (or perhaps as much as one hour earlier). The only way that White Eyes provided an alibi at all was if the jury disbelieved his testimony concerning the times that he was

---

9. Sprik claims that this theory was never presented to the jury either in opening argument or in testimony. This is not accurate.

10. N.G. told the police about Sprik and his companion during her first contact with them. That was the reason the police immediately took her

back to Hardee's that night to look for the friend. Since Sprik and White Eyes were only together at Hardee's toward the end of their evening together, there is no way that N.G. would have known that information unless she was at Hardee's at the time.

with Sprik and accepted Jeannie Melton's testimony that White Eyes and Sprik were together at Hardee's at 1:00 a.m., give or take twenty minutes. However, the value of her testimony that Sprik left Hardee's at that time and went south away from Memorial Park is compromised by Officer James' observations of Sprik north of Hardee's and coming from the direction of Memorial Park within a short time afterwards.

[¶ 38.] An alibi defense which is entirely dependent upon a witness who was intoxicated and cannot identify the defendant as the person he was with, and which requires that significant portions of his testimony be disbelieved is certainly not an "excellent" alibi defense as claimed by Sprik.

[¶ 39.] As pointed out above, the decision to use or not use particular trial tactics and defenses is exclusively for trial counsel, and this Court will not attempt to second guess counsel in those kinds of decisions. The only time that this Court will hold that failure to raise a defense is sufficient to constitute ineffective assistance of counsel is when that failure is so clear that no reasonable attorney would have done as trial counsel did.

[¶ 40.] In connection with alibi defenses this Court has stated:

> " 'Alibi evidence must show that the accused could not have committed the alleged crime, because at the time of its commission he was at a place other than where such offense was committed.' " *"An alibi 'to be successful must cover the **entire time** when [appellant's] presence was required for accomplishment of the crime.... [A] purported alibi that leaves it possible for the accused to be the guilty person is no alibi at all.'* " (citations omitted).

*State v. Goodroad,* 521 N.W.2d 433, 440 (S.D. 1994).

[¶ 41.] In this case, trial counsel explained why he chose not to use an alibi defense. The alibi was a weak one. Although the "revenge" defense was unsuccessful, there is no reason to believe that the "alibi" defense would have been any more successful. Sprik failed to meet his burden of proving that trial counsel's choice of the "revenge" defense

rather than an "alibi" defense was so obviously wrong that it did not fall within the realm of competence required of counsel.

### B. Failure to Move to Suppress the Show-up.

[¶ 42.] Sprik also claims that his representation was deficient because trial counsel failed to file a motion to suppress the "show-up" which took place in the alley behind the Firehouse Brewery. Sprik claims that this motion would likely have succeeded because N.G.'s description of her assailant was significantly different from Sprik's actual appearance, that the show-up was one and one half hours after the assault, and that there were many intervening opportunities for N.G.'s identification to be tainted.

[¶ 43.] This argument is based entirely upon misrepresentations of the record. N.G.'s description was accurate. The show-up was one hour after the assault ended, but it was within five minutes of the time when Sprik was taken into custody. Sprik has failed to show any way in which the identification was tainted.

[¶ 44.] Trial counsel also explained that he did not make a motion to suppress because such a motion was inconsistent with the "revenge" defense upon which he was relying. If Sprik was with N.G. that night, it didn't make any sense to argue that N.G. couldn't identify Sprik. Trial counsel testified that he considered attempting to suppress the show-up but decided not to make the motion for this reason.

[¶ 45.] The decision as to whether or not to make motions or objections at trial is within trial counsel's discretion unless counsel's actions cannot reasonably relate to any strategic decision and are clearly contrary to the actions of competent counsel in similar circumstances. *Roden,* 431 N.W.2d at 667; *State v. Anderson,* 387 N.W.2d 544, 546 (S.D. 1986). This Court cannot say that trial counsel's decision did not reasonably relate to any strategic decision or that it was clearly contrary to the actions of competent counsel in similar circumstances.

[¶ 46.] Even if the motion should have been made by competent counsel, the second prong of the *Strickland* test requires

that Sprik show that, but for this failure, the results of the proceeding would probably have been different. Although Sprik argues that the show-up would have been suppressed because the victim's description was inaccurate and may have been tainted prior to the show-up, even Sprik's expert witness testified that if the motion had been made, it would not have been granted. Consequently, this failure, if it was a failure, would not have affected the ultimate results of the trial.

### C. Failure to Make an Offer of Proof

[¶ 47.] During the preliminary hearing, N.G. mentioned that she was on probation. Trial counsel then requested that he be given access to her juvenile court records. Initially the trial court ordered that he should have access to them but before he could review the records, the trial judge informed trial counsel that he had reviewed them *in-camera* and determined that they were not relevant. He then denied trial counsel access to the records.

[¶ 48.] In the direct appeal this Court indicated that Sprik's failure to make an offer of proof as to those juvenile records prevented direct review of them. Those records are now before the Court for review and Sprik points to four matters from the juvenile records which he feels could have been raised to attack the victim's credibility if the records had been made available. These were 1) that she was on probation for "false personation;" 2) that she was under a house arrest order from Judge Konenkamp; 3) that the Adolescent Care Center later reported to Judge Konenkamp that N.G. live[s] in a "make believe" fantasy world. She twists the truth to create a false impression but does not see this as lying, and that the victim "is afraid of having her mistakes discovered, so she lies to cover up;" and 4) that her juvenile record would have disclosed her motive or reason for lying.

[¶ 49.] It is true that N.G.'s testimony was absolutely crucial to the State's case. However, as this Court said in the direct appeal, "even without access to [victim's] juvenile records [victim] was subject to extensive cross examination concerning her credibility." *Sprik*, 520 N.W.2d at 600. The habeas

court held that the failure to make this offer of proof was a deficiency in trial counsel's performance but that it was not such a deficiency as would have affected the results of Sprik's trial.

[¶ 50.] Shortly before trial N.G. admitted that the story which she told to the police and at the preliminary hearing was untrue and that she had voluntarily gone to the park with Sprik in response to an offer for free drugs. This changed story was disclosed to the defense as soon as the prosecutor was aware of it and trial counsel examined her extensively about her lies. The cross examination took over thirty pages in the trial transcript and was almost entirely an attack on her credibility. During her direct and redirect examination by the State, N.G. also admitted to numerous lies.

[¶ 51.] During the trial N.G. made the following admissions in front of the jury:

She was a drug addict and alcoholic.

She lied to her mother on numerous occasions.

She ran away from home that night.

She ran away from home on other occasions.

She lied to the driver who picked her up.

She asked her boyfriend to lie for her.

She lied to Officer Shegstad.

She lied to Officer Hammond.

She lied during her taped interview with the police.

She lied about where she lived.

She lied when she claimed that her father was a cop.

She lied about Sprik forcing her into the park.

She lied about kicking him.

She lied about pushing him down.

She lied about him pulling her down on the grass.

She lied under oath at the preliminary hearing.

She lied about violating curfew.

She lied about skipping school.

She lied about using drugs and alcohol.

[¶ 52.] In addition, the trial court allowed testimony that N.G. may have been working as a prostitute and that she tried to get others to "beat up" Sprik because of what happened.

[¶ 53.] Although the jury may not have known that N.G. had a juvenile adjudication for false personation (a misdemeanor offense), N.G. freely admitted that she lied under oath during the preliminary hearing which is much more serious than the false personation charge which the jury was not aware of. In addition, the jury was told that N.G. was on probation, that she was in violation of her curfew and that she was a runaway. Since the jury knew those things about N.G. it would have made little difference if they also knew that she was under house arrest. Many examples of N.G.'s dishonesty were introduced at trial and she admitted numerous instances of lying. The inclusion of a few more examples of lying would not have achieved a different result.

[¶ 54.] *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) requires access to juvenile records if they show a potential motivation by the juvenile witness to lie.[11] In this case, the juvenile's potential motivation was to cover up for her violation of house arrest, but the jury already knew she was on probation at the time, that she had violated her curfew and that she was a runaway. The motivation to lie had also disappeared at the time of this trial since she had already been sentenced in juvenile court.[12]

[¶ 55.] As stated by the habeas court, "[It]is difficult to imagine what more could have been added by the information in [victim's] juvenile records to impeach her credibility."

■ [¶ 56.] Sprik makes other arguments about ways in which trial counsel should have impeached N.G. but that would not have changed the results of the trial in light of the extensive impeachment to which she was subjected. Failure to call a witness desired by the defendant is not ineffective assistance of counsel where other witnesses testified to the same thing. *Garritsen v. Leapley*, 541 N.W.2d 89, 96 (S.D.1995). At trial N.G. was extensively cross-examined and her credibility was subjected to attack on numerous grounds. She admitted that she had lied to virtually everyone that she talked to on the night of the offense. Other testimony that she had lied would have been cumulative.

### D. Failure to Cross-examine Jerri Knapp.

■ [¶ 57.] Sprik claims that it was a serious error for trial counsel to fail to cross-examine Jerri Knapp to discredit N.G.'s testimony as to her activities that evening. According to Sprik, if Knapp had been properly cross-examined she would have provided significant discrediting testimony. Sprik claims that Knapp would have impeached N.G. by testifying about taking her to Roosevelt Park that night and about a conversation in which N.G. identified the perpetrator as the "weird guy in the bow tie."

[¶ 58.] Knapp did testify at the trial in 1993 and was cross-examined by trial counsel. Her trial testimony was different from what she had told investigators before the trial. In 1995 she gave a completely different statement to an investigator for the State. Significant portions of the story that she told in 1995 are different from what she told the police in 1992 or testified to in 1993. 1995 was the first time that Knapp told anyone about giving N.G. a ride to Roosevelt Park at 10:00 p.m. on the night of the rape. Knapp did not mention that when she was questioned by the police in 1992 or when she testified at the trial in 1993.

[¶ 59.] Sprik did not call Knapp as a witness at the habeas proceeding so there is no way of knowing what she would have testified to at this time under oath and subject to cross examination. However, there is no

---

11. Although Sprik claims that Davis holds that counseling records must be disclosed, there is no discussion of counseling records in that case.

12. While Sprik claims that N.G. still had a motive to lie at trial in order to tell a story which was consistent with what she had told the police earlier, in fact, she was not telling the same story at the time of trial that she had told the police earlier and the story she told at trial would not have excused or justified her absence from home that night.

reason to attribute Knapp's embellished story in 1995 to any deficiency in trial counsel's cross-examination in 1993. At trial he attempted to examine Knapp concerning her contacts with N.G. that night.

Q. Did she have a personal conversation then with you when she got back the second time?

A. I don't recall to be honest.

Q. Would you say that you did recall that she had told you or somebody that she had just been raped?

A. I don't know.

Q. Didn't you wonder why she was there with the police?

A. Yes, I did, but I didn't have time to stop and ask questions.

Q. Except you invited her back to the phone?

A. I didn't invite her back. I am not a manager. It is not my place to. The manager did.

[¶ 60.] In light of this testimony there was no reason for trial counsel to have anticipated that Knapp would now claim to have been driving N.G. around Rapid City that night.

[¶ 61.] Knapp told the police about the "weird guy" statement by N.G. shortly after the rape occurred and it is contained in the police reports. During his cross examination of Knapp, trial counsel attempted to get to the conversations that she had with N.G. on the night of the rape, presumably to get to that statement. His efforts were frustrated by Knapp's testimony that she could not recall any conversation with N.G. at that time. It was difficult for trial counsel to get at the "weird guy" statement since Knapp denied any recollection of even talking to N.G. when she returned to Hardee's with the police.[13] In light of Knapp's claimed inability to recall any conversations with N.G. on the night of the rape, it is doubtful that trial counsel could have done anything more with her that would have made any difference in this case.

[¶ 62.] We have reviewed the record in respect to the other arguments raised by

Sprik and have determined that they are without merit.

[¶ 63.] We affirm the denial of the writ of habeas corpus.

[¶ 64.] MILLER, C.J., and AMUNDSON and GILBERTSON, JJ., concur.

[¶ 65.] SABERS, J., concurs in result.

[¶ 66.] RUSCH, Circuit Judge, for KONENKAMP, J., disqualified.

SABERS, Justice (concurring in result).

[¶ 67.] I concur in result on the basis that the petitioner failed to establish prejudice sufficient to satisfy the second prong of the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

---

13. It should also be noted that two different Hardee's' employees described Sprik as the "weird guy" when they were interviewed by the police. If that was the usual way of identifying Sprik at Hardee's, that could explain N.G.'s reference.