#30503-a-MES
**2024 S.D. 41**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

BEAU FOOTE, SR.,                                      Petitioner and Appellant,

    v.

DARRIN YOUNG, Warden of the
South Dakota State Penitentiary,                     Respondent and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
STANLEY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BOBBI J. RANK
Judge

* * * *

LINDSEY L. RITER-RAPP of
Riter, Rogers, LLP
Pierre, South Dakota                                 Attorneys for petitioner and
                                                     appellant.


MARTY J. JACKLEY
Attorney General

MATTHEW W. TEMPLAR
Assistant Attorney General
Pierre, South Dakota                                 Attorneys for respondent and
                                                     appellee.

* * * *

CONSIDERED ON BRIEFS
JUNE 6, 2024
OPINION FILED **07/17/24**

#30503

SALTER, Justice

[¶1.]　　　　Beau Foote Sr. is currently serving prison sentences for his convictions of aggravated assault on a law enforcement officer with a deadly weapon.  Foote filed a petition for a writ of habeas corpus alleging his trial counsel rendered ineffective assistance.  After an evidentiary hearing, the habeas court denied Foote's request for habeas relief.  It issued a certificate of probable cause, and Foote appeals.  We affirm.

## Factual and Procedural Background

[¶2.]　　　　In September 2017, law enforcement officers learned that Beau Foote Sr., who had an outstanding arrest warrant for a parole violation, was in a trailer home in Fort Pierre.  Stanley County Deputy Sheriff Greg Swanson and Foote's parole officer, Agent Michael Stolley, went to the trailer home to execute the warrant.  While Deputy Swanson waited at the back door, Agent Stolley knocked on the front door, announcing that officers were present and attempting to locate Foote.  Receiving no verbal response but hearing shuffling, the officers made entry through the unlocked doors.

[¶3.]　　　　When they entered, Foote was lying on the ground.  Agent Stolley attempted to handcuff Foote, but Foote jumped up and tried to flee the home.  Deputy Swanson stopped him by pushing Foote onto the couch.  The physical contact between the men caused Deputy Swanson's taser[1] to fall from its holster.

---

1.　　　The term TASER is an acronym derived from the 1911 novel, *Tom Swift and His Electric Rifle*.  Kiona N. Smith, *Why is it Called a Taser?*, Forbes (April 6, 2019, 2:16 AM), https://www.forbes.com/sites/kionasmith/2019/04/06/why-is-it-called-a-taser/?sh=4b53fd807628.  Although it is used by a company of the

(continued . . .)

-1-

The two men grabbed the taser and were struggling over it when its probes fired into the nearby couch. Deputy Swanson got tangled in the wires, which delivered an electrical shock to his arms, incapacitating him.

[¶4.] Next, Foote pushed the taser into Agent Stolley's chest and pulled the trigger. But due to Agent Stolley's bullet-proof vest, he was not shocked. Finally, Agent Stolley drew his firearm and ordered Foote to drop the taser. He did, and officers handcuffed him.

[¶5.] Still, Foote continued to be combative after being handcuffed, attempting to bite and trip officers and shouting obscenities at them. Once in the back of the patrol vehicle, Foote intentionally hit his head against the window. To keep Foote from hurting himself, the Stanley County sheriff rode in the back of the vehicle with Foote to the jail. After Foote had been removed from the scene, both Deputy Swanson and Agent Stolley discovered they had suffered injuries from the encounter inside the trailer home.

[¶6.] Foote was charged with two counts of aggravated assault on a law enforcement officer with a dangerous weapon and, in the alternative, two counts of simple assault on a law enforcement officer. He was also charged with resisting arrest. The State filed a part II information, alleging Foote had six prior felony convictions, one of which included a crime of violence.

[¶7.] Attorney Brad Schreiber was appointed to represent Foote. For much of the case, plea discussions were at the forefront, but an agreement was never

---

(. . . continued)
same name, the word "taser" is also frequently used as a common reference to stun guns.

reached. At one point, Foote indicated that he would accept the State's plea offer, but just before the change of plea hearing, he changed his mind and decided he wanted to go to trial.

[¶8.] At the two-day jury trial, the State presented testimony through eight witnesses, two of whom testified as to the function and operation of tasers. The first was Jeff Hill who identified himself as a park ranger with the South Dakota Department of Game, Fish, and Parks, and the other was Don McCrea, an instructor at the South Dakota Law Enforcement Training Center. Both Hill and McCrea were listed as potential witnesses in the State's pretrial disclosures, which described the subject of their prospective testimony as "[t]aser function and operation." The State also indicated that Hill would testify about the data report obtained from Deputy Swanson's taser after the encounter with Foote. They were not specifically designated as expert witnesses, and the circuit court had not ordered the disclosure of expert witnesses.

[¶9.] The jury found Foote guilty on both counts of aggravated assault against a law enforcement officer and guilty of resisting arrest. Foote also admitted to the part II information, and the circuit court sentenced him to fifteen years in the South Dakota Penitentiary[2] with five years suspended on each of the aggravated assault counts, ordered to run consecutively. The court imposed a jail sentence for the resisting arrest conviction that has since been served.

[¶10.] Foote appealed, and we affirmed his convictions. *See State v. Foote (Foote I)*, 2019 S.D. 32, 930 N.W.2d 650. On direct appeal, Foote challenged his

---

2. Foote is now an inmate at the Mike Durfee State Prison.

aggravated assault convictions with a textual argument relating to SDCL 22-1-2(10), which defines a "dangerous weapon" as it is used in the aggravated assault statute, SDCL 22-18-1.1(2). Foote argued that the State failed to present sufficient evidence "to prove he possessed a dangerous weapon[,]" claiming "a Taser is not a dangerous weapon because it was not calculated or designed to cause serious bodily injury or death and it was not used in a manner that was likely to inflict death or serious bodily harm." *Foote I*, 2019 S.D. 32, ¶ 8, 930 N.W.2d at 652.

[¶11.] We rejected this argument, citing a different provision of SDCL 22-1-2(10) that specifically designates a "stun gun" as a dangerous weapon. *See* SDCL 22-1-2(50) (defining a stun gun as a "battery-powered, pulsed electrical device of high voltage and low or no amperage that can disrupt the central nervous system and cause temporary loss of voluntary muscle control of a person"). Our conclusion in this regard was supported by testimony from McCrea, who stated that "Deputy Swanson's Taser is a type of 'stun gun' because 'it is [a] conductive electronic weapon. . . . It sets up a major neurological interface, . . . and people cannot operate properly, and it sends their muscles into overload and spasms and creates quite a bit of pain.'" *Foote I*, 2019 S.D. 32, ¶ 12, 930 N.W.2d at 653 (alterations in original).

[¶12.] Foote also challenged his convictions on the basis of his claim that he had not attempted to use the taser to cause bodily harm. In his view, "the evidence established he merely acted in an effort to get away and avoid being arrested." *Id.* ¶ 10, 930 N.W.2d at 652. However, applying our settled standard that requires us to view the evidence in favor of the verdict, we determined that "the jury could have

concluded Foote attempted to use the Taser in a manner likely to inflict serious bodily harm upon the officers." *Id.* ¶ 15, 930 N.W.2d at 653.

[¶13.] After his convictions were final, Foote filed a pro se application for writ of habeas corpus, alleging three grounds for relief that included a double jeopardy claim, an Eighth Amendment cruel and unusual punishment claim, and an allegation that he received ineffective assistance of counsel. The habeas court appointed counsel for Foote, and in an amended application, Foote alleges his incarceration "is unconstitutional in that it is the product of ineffective assistance and [sic] counsel and it is violative of due process."

[¶14.] The habeas court held an evidentiary hearing, at which Foote's trial counsel, Brad Schreiber, and Foote himself testified. Schreiber explained that he considered Hill and McCrea to be experts from the outset based on the State's pretrial disclosures. Schreiber acknowledged he did not challenge their qualifications because, in his view, he "didn't feel the need to." He believed he could elicit information that would be favorable to Foote from the experts on cross-examination. Schreiber's research relating to taser use led him to believe he could get the experts to admit that the taser was not specifically designed to cause serious injury or death. Because of this, and because he did not think an expert would provide any additional benefit to Foote's defense, Schreiber decided not to hire an expert on Foote's behalf.

[¶15.] When asked about his trial strategy, Schreiber described two goals: first, he sought to convince the jury that Foote was only attempting to get away from officers and, therefore, he did not attempt to cause or knowingly cause bodily

injury to the officers; and second, Schreiber would attempt to convince the jury that the taser did not meet the "dangerous weapon" definition because it was not specifically calculated or designed to inflict death or serious bodily injury. Schreiber indicated that his decisions to not object to the expert witnesses' testimony and to not hire a defense expert were in furtherance of this second goal.

[¶16.] Foote testified that he felt "like my case didn't matter." But when asked why he felt that way, all he could say was, "I don't know." He also admitted that he had, at one point, been quite pleased with Schreiber's representation. In fact, in a letter to Schreiber after receiving a copy of his appellate brief, Foote wrote, "I got the brief you sent me. I read it and it made me shed some tears because about time the truth comes out. Brief couldn't be done better. I like it." Nevertheless, based on independent research Foote had done after his convictions were affirmed on appeal, Foote now believes that Schreiber should have hired a taser expert.

[¶17.] The parties submitted written closing arguments, and the habeas court entered findings of fact and conclusions of law, determining that Foote failed to meet his burden to prove Schreiber had provided ineffective assistance of counsel. The court entered an order denying habeas relief.

[¶18.] However, the habeas court granted Foote's request for a certificate of probable cause on the issue "whether the legal representation received by Petitioner Beau Foote Sr. constituted Ineffective Assistance of Counsel." In October 2023, we issued an order to show cause, asking the parties whether the appeal should be dismissed due to a lack of information in the certificate of probable cause showing

Foote was denied a constitutional right. Both parties submitted briefs, and we ordered that the appeal "proceed in accordance with the applicable rules of appellate procedure."[3]

### Analysis and Decision

[¶19.] We have observed that "habeas corpus actions are exceptional in the sense that they represent post-conviction, collateral attacks on otherwise final judgments of conviction." *Ceplecha v. Sullivan*, 2023 S.D. 63, ¶ 25, 998 N.W.2d 351, 357–58 (citing *Piper v. Young*, 2019 S.D. 65, ¶ 21, 936 N.W.2d 793, 803–04). Yet habeas actions remain as a salutary means of correcting "certain types of errors in an underlying criminal action by challenging the authority of an official to hold the petitioner." *Id.* ¶ 25, 998 N.W.2d at 358.

[¶20.] Habeas corpus actions are particularly suited to address claims that a petitioner was denied a Sixth Amendment right to effective assistance of counsel in the trial court proceeding. *See Piper*, 2019 S.D. 65, ¶ 21, 936 N.W.2d at 804 (noting that only three subjects are proper for habeas review, one of which is the deprivation of basic constitutional rights); *see also State v. Townsend*, 2021 S.D. 29, ¶ 32, 959 N.W.2d 605, 614 (stating that "[h]abeas corpus proceedings are the preferred arena for an ineffective assistance of counsel claim primarily because the attorneys charged with ineffectiveness can explain or defend their actions and strategies" (cleaned up) (citation omitted)). "We review a circuit court's

---

3. As it did in its response to the order to show cause, the State continues to challenge the existence of appellate jurisdiction in its brief. However, we view our order to proceed with the appeal as having settled the jurisdictional inquiry.

determination of a Sixth Amendment ineffective assistance of counsel claim as a mixed question, reviewing the court's decision on the constitutional issue de novo and its findings of fact for clear error." *Reay v. Young*, 2019 S.D. 63, ¶ 13, 936 N.W.2d 117, 120 (citation omitted).

[¶21.] The two-pronged ineffective assistance of counsel standard set out in *Strickland v. Washington* is a familiar one:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).

[¶22.] Under *Strickland's* first prong, a petitioner "must rebut the 'strong presumption' that counsel was competent." *Reay*, 2019 S.D. 63, ¶ 14, 936 N.W.2d at 121 (citation omitted). We cannot "second guess the decisions of experienced trial attorneys regarding matters of trial tactics" and, instead, we must make "every effort . . . to eliminate the distorting effects of hindsight[.]" *Id.* (citations omitted).

[¶23.] And as to *Strickland's* second prong, "we have held that prejudice from deficient representation exists when 'there is a reasonable probability of a different outcome.'" *Id.* ¶ 15 (quoting *Knecht v. Weber*, 2002 S.D. 21, ¶ 5, 640 N.W.2d 491, 495); *see also State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686 (applying same standard for determining actual prejudice in connection with mistrial motions). It

is well-settled that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Reay*, 2019 S.D. 63, ¶ 15, 936 N.W.2d at 121 (citation omitted).

[¶24.] In this appeal, Foote identifies three ways in which he believes Schreiber rendered ineffective assistance of counsel: (1) Schreiber's failure to object to the State's disclosure of its experts; (2) Schreiber's decision not to challenge the experts' qualifications; and (3) Schreiber's decision not to engage an expert to rebut the testimony of the State's taser experts.[4] We review each claim in turn.

### *Failure to object to expert disclosure*

[¶25.] SDCL chapter 23A-13 governs discovery in criminal cases. Nothing in that chapter, or elsewhere, outlines a specific procedure for disclosing expert witness testimony. *Cf.* Fed. R. Crim. P. 16(a)(1)(G) (requiring the prosecution to disclose expert witnesses when requested by the defendant). Nor has Foote identified any authority requiring earlier disclosure for expert witness testimony, though, of course, circuit courts often enter orders that address the parties' witness disclosures. *See, e.g.*, *State v. Pretty Weasel*, 2023 S.D. 41, ¶ 34, 994 N.W.2d 435, 442 (stating that an expert witness's testimony "was subject to the court's pretrial orders").

---

4. At the evidentiary hearing, Foote's habeas counsel alleged other bases for Foote's ineffective assistance claim which are not presented in this appeal. For instance, she extensively questioned Schreiber about the amount of time he spent on Foote's case, asking Schreiber about his legal bills and the jail's visitation logs in an apparent attempt to establish he did not spend adequate time on Foote's case. She also inquired into the plea discussions, alleging that Schreiber had miscommunicated one of the State's plea offers to Foote and also suggesting that Schreiber was focused on Foote accepting a plea agreement rather than preparing a defense.

[¶26.]	Here, the circuit court's pretrial order was not truly a discovery order as much as it was an order to assist the parties with trial preparation. It was issued a little over two months before the trial and required, among other things, that both parties provide opposing counsel with a list of proposed witnesses according to prescribed deadlines. The order did not distinguish between lay and expert witnesses. The State timely complied and provided the defense with a list of potential witnesses and a brief summary of their anticipated testimony. This list included Hill and McCrea and indicated that each would testify about "the function and operation" of tasers.

[¶27.]	Under the circumstances, the State did not fail to comply with a discovery rule or order, and, simply put, there was no basis upon which Schreiber could have objected. Foote cannot, therefore, demonstrate that Schreiber's performance fell below an objective standard of reasonableness.

### Failure to challenge Hill and McCrea's qualifications

[¶28.]	Our rules of evidence state that a witness's testimony, if not testifying as an expert, is limited to opinion testimony that is: "(a) Rationally based on the witness's perception; (b) Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) Not based on scientific, technical, or other specialized knowledge within the scope of § 19-19-702." SDCL 19-19-701. Conversely, the rule governing expert testimony states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.

SDCL 19-19-702 (Rule 702).

[¶29.] "The decision as to whether or not to make objections at trial is within the trial counsel's discretion unless counsel's actions cannot reasonably relate to any strategic decision and are clearly contrary to the actions of competent counsel in similar circumstances." *Sprik v. Class*, 1997 S.D. 134, ¶ 45, 572 N.W.2d 824, 832 (citation omitted); *see also State v. Phillips*, 2018 S.D. 2, ¶ 24, 906 N.W.2d 411, 418 (noting that counsel may choose to not challenge an expert's qualifications when he believes the expert is "properly qualified" or when challenging an expert's qualifications "would pointlessly detract from the material issues and the credibility of the defense").

[¶30.] Here, Schreiber correctly understood that Hill and McCrea were experts. Their testimony regarding taser function and operation is not the kind of knowledge that is known to a layman, and their opinions were based on specialized knowledge of tasers that they received through their knowledge, skill, experience, and training.[5]

---

5. Though Foote alleges Schreiber should have objected to the admission of Hill and McCrea's testimony, he does not indicate a basis for such a challenge. He has not, for instance, alleged or sought to establish that their opinions were not relevant or were unreliable. *See State v. Guthrie*, 2001 S.D. 61, ¶ 34, 627 N.W.2d 401, 416 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469, 485 (2001)) (stating that "the court must ensure that the [expert] opinion abides on a reliable foundation").

[¶31.] Schreiber also understood the substance and nature of the proposed expert taser evidence, and his decision to not challenge them was part of a reasonable trial strategy. Schreiber planned to use the cross-examination of Hill and McCrea to Foote's advantage. Based on his research, Schreiber correctly anticipated that Hill and McCrea would testify that the taser was not designed to inflict serious bodily injury or death, which would support Schreiber's dangerous-weapon theory. Therefore, choosing not to challenge Hill and McCrea's qualifications was a strategic decision that does not satisfy the first prong of *Strickland's* ineffective assistance of counsel test.

### Failure to hire a taser expert

[¶32.] We have recognized that "[g]enerally, failure to hire an expert is not, per se, error" but, rather, the decision to hire an expert "is a matter of trial strategy[.]" *Spaniol v. Young*, 2022 S.D. 61, ¶ 26, 981 N.W.2d 396, 404 (cleaned up) (citation omitted). A defense lawyer's decision about whether to hire an expert is "entitled to a 'strong presumption' of reasonableness" because the lawyer "must choose from 'countless' strategic options." *Id.* (quoting *Dunn v. Reeves*, 594 U.S. 731, 739, 141 S. Ct. 2405, 2410, 210 L. Ed. 2d 812 (2021)).

[¶33.] Depending on the circumstances, a defense lawyer may reasonably believe, as a matter of trial strategy, that cross-examination of the State's expert will be favorable to the defendant. In these instances, the lawyer may justifiably believe retaining a defense expert is unnecessary. *Phillips*, 2018 S.D. 2, ¶ 24, 906 N.W.2d at 418 (noting that "[c]ounsel may have . . . believed that cross-examination [of the State's expert] would have made retention of another expert unnecessary").

[¶34.] Schreiber's decision to not hire an expert witness was part of a sound trial strategy. The first aspect of Schreiber's defense theory—Foote was only trying to flee, not harm officers—would not have benefited from expert testimony. Instead, Schreiber was able to use his cross-examination of Deputy Swanson and Agent Stolley to support this theory. Both admitted that they did not know Foote's intentions or what he was thinking throughout the encounter. Deputy Swanson also admitted that he could have possibly been the one to push the button that deployed the taser wires during the struggle rather than Foote. And Agent Stolley acknowledged that Foote started running away, rather than towards officers, when Agent Stolley attempted to arrest him.

[¶35.] And as to his theory that a taser is not a dangerous weapon, Schreiber was confident that, based on his research, Hill and McCrea would acknowledge on cross-examination that a taser was not designed to inflict serious bodily injury or death, which they both did to some extent:

Schreiber: Mr. Hill, a Taser isn't designed to be a lethal weapon is it?

Hill: It was not. I believe, the intent was not lethal, but it has been lethal.

Schreiber: Rare circumstances?

Hill: Anymore, I don't know if it is that rare.

Schreiber: Do you know anybody around here that has been killed by a Taser?

Hill: In South Dakota, I do not.

****

> Schreiber: Okay. You're not saying that a handgun firearm is equally as dangerous as a Taser, are you?
>
> McCrea: No.
>
> Schreiber: When a law enforcement officer uses a Taser or they had to deploy it, I assume, it is not being used as a deadly weapon?
>
> McCrea: That is not the intent, yes. In the average discharge of a Taser, the intent is not to be using that Taser or applying it in a manner that would be considered deadly force.
>
> Schreiber: What is the intent to use a Taser in law enforcement?
>
> McCrea: In order to deescalate a situation and bring combative individuals under control.

[¶36.] Foote notes that McCrea, however, stated a taser is a form of a stun gun, which SDCL 22-1-2(10) includes in its definition of dangerous weapon, and Schreiber, in fact, acknowledged this statement hindered Foote's case.[6] But we cannot view Schreiber's decision with the benefit of hindsight. Schreiber's decision to not hire a taser expert was a strategic one made in the course of trial.[7]

---

6. Hill also stated that "[m]y interpretation is [a taser] is a stun gun." Foote does not allege that Schreiber unreasonably failed to identify the taser as a stun gun.

7. It is also plausible that a defense taser expert would have recognized the stun gun aspect of tasers which would have emphasized McCrea's testimony in this regard.

*Prejudice*

[¶37.]    Even if Foote could satisfy prong one of *Strickland*, he could not establish prejudice under prong two. First, we note that Foote does not set forth the manner in which he asserts he was prejudiced. Instead, he merely concludes he was prejudiced "[g]iven the totality of the errors[.]"[8]

[¶38.]    Regardless, the record confirms that Foote was not prejudiced. Whether Hill and McCrea were identified as experts, Schreiber's trial preparation was not adversely impacted. He testified at the habeas hearing that he could anticipate the nature of their testimony. He was able to conduct research to prepare for his cross-examination of both witnesses, which, based on our review of the trial transcript, reflects a discernible and apparent level of skill and preparation.

[¶39.]    Further, had Schreiber challenged Hill and McCrea's qualifications, we cannot conceive of a basis for success. Nor has Foote offered one. As indicated above, Hill and McCrea appear to be experts, and the circuit court likely would have found them qualified under Rule 702. Both men had been working with tasers since the time they became standard in the law enforcement setting, and both had completed taser-specific training. McCrea was certified as a taser operator, and Hill

---

8.    We have previously declined to accept sweeping "cumulative error" arguments "because to do so would recognize a degree of error that is greater than the sum of its parts." *Young*, 2019 S.D. 63, ¶ 26 n.7, 936 N.W.2d at 124 n.7; *see also Ally v. Young*, 2023 S.D. 65, ¶ 69, 999 N.W.2d 237, 260.

was a taser instructor. Additionally, their testimony aided the jury's understanding of the incident itself and of the taser report from Deputy Swanson's taser.[9]

[¶40.] Foote argues that, had Schreiber objected to the experts' qualifications, the circuit court would have excluded the testimony of at least one witness as cumulative. *See* SDCL 19-19-403 (Rule 403) (stating that the court may exclude otherwise relevant evidence "if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence"). But Schreiber made this exact argument to the circuit court when he objected to McCrea's testimony.[10] And after hearing the State's response, the court overruled the objection, telling the State, "I'll give you some latitude on it at this point."

[¶41.] Finally, Foote did not provide an offer of proof that identified who Schreiber should have called as an expert or what opinions he should have elicited. *See Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990) (stating that "[t]o affirmatively prove prejudice, a petitioner ordinarily must show not only that the testimony of uncalled witnesses would have been favorable, but also that those witnesses would have testified at trial"). And mere speculation about a hypothetical

---

9. Hill generated the taser report by downloading information from a data processor within Deputy Swanson's taser. The report indicated that on September 29, 2017, at approximately 9:11 AM, the taser was "armed," meaning it was turned on and the safety was turned off. Shortly after, the trigger was pulled, and the first of two cartridges of wires was deployed. Moments later, the second cartridge was deployed. The report also indicated the trigger was subsequently pulled two more times. Hill testified that, after both cartridges have been deployed, a taser can still be used to "drive stun" when the weapon itself is in close contact with its target.

10. Schreiber interposed, "Your Honor, I want to make an objection. This sounds like testimony we just got done listening to, and it is cumulative[.]"

expert witness is not sufficient to carry his burden. *Knecht*, 2002 S.D. 21, ¶ 20, 640 N.W.2d at 500 ("Conjecture or speculation is not sufficient to establish the required prejudice flowing from the failure to call a witness to testify."). "The fact that an expert could have strengthened the [dangerous-weapon] theory does not equate to ineffective assistance." *Id.*

[¶42.]     Even without a defense taser expert, the jury still heard expert testimony that supported Schreiber's theory that a taser is not a dangerous weapon. It was able to weigh that testimony against the remaining evidence and ultimately rejected that theory. Foote cannot prove that, but for these decisions, there is a reasonable probability that the outcome of his trial would have been different.

## Conclusion

[¶43.]     Foote is not entitled to habeas relief because he has failed to establish that Schreiber rendered ineffective assistance of counsel. We affirm the habeas court.

[¶44.]     JENSEN, Chief Justice, and KERN, Justice, and FITZGERALD, Circuit Court Judge, concur.

[¶45.]     MYREN, Justice, concurs specially.

[¶46.]     FITZGERALD, Circuit Court Judge, sitting for DEVANEY, Justice, who deemed herself disqualified and did not participate.

MYREN, Justice (concurring specially).

[¶47.]     I join the portion of the Court's opinion that concludes that Foote has failed to establish the first prong of *Strickland's* ineffective assistance of counsel

test.  Given that holding, it is unnecessary to address the prejudice prong and I would not do so.  For that reason, I do not join that portion of this opinion.