**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alexander COOPER and Anthony Davis, also known as "Future", Defendants–Appellants.**

**Nos. 91–3800 & 92–1375.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1994.

Decided March 23, 1994.

Stephen P. Sinnott, argued, Andrea L. Davis, Barry R. Elden, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

Jeffrey Urdangen argued, Cynthia Giacchetti, Chicago, IL, for Anthony Davis.

James W. Reilley, Reilley & Associates, Des Plaines, IL, Rick Halprin, Carol Repasky, argued, Chicago, IL, for Alexander Cooper.

Before EASTERBROOK and RIPPLE, Circuit Judges, and MIHM, District Judge.*

MIHM, District Judge.

In 1983, Robert Parker started working for Alexander Cooper laundering and investing proceeds from Cooper's drug enterprise. In July 1988, Parker contacted the Internal Revenue Service for the purpose of providing detailed information concerning Cooper's financial assets and drug trafficking. This contact eventually led to federal agents setting Parker up as an informant operating from an office and apartment at the Doral Plaza hotel in Chicago's Loop area. From the Doral, federal agents planned to monitor Cooper's drug enterprise.

In early January 1989, Cooper discovered that Parker was acting as an informant for the government and began making arrangements to get rid of him. Cooper met several times with high-level members of his organization, including Anthony Davis, regarding the problem Parker posed to the organization. On the evening of February 6, 1989,

Cooper had other members of his organization pick Parker up at the Doral and transport him to the Stop Restaurant, located at 6607 S. King Drive, Chicago, Illinois. After a brief conversation with Cooper, Parker and Davis left the restaurant together. Shortly before midnight, Parker's body was discovered laying by the curbing on a Chicago street. He had been shot five times, twice in the head, with a .380 caliber semiautomatic pistol.

Federal agents arrested Cooper on July 23, 1989. At the time of the arrest, Cooper had in his possession almost $130,000 in cash, approximately $150,000 in jewelry, travel documents for Brazil and Nigeria, and false identification, including an application for a passport in a false name. On July 24, 1989, pursuant to a search warrant, Chicago Police searched Davis's apartment. The Police found cocaine, drug paraphernalia, a loaded .357 magnum revolver, a .22 caliber rifle, an empty .380 caliber ammunition box, and pictures of Davis posing with guns. On May 24, 1990, federal agents arrested Davis.

## STATEMENT OF THE CASE

Appellants Anthony Davis and Alexander Cooper, along with 19 other defendants, were named in a 62 count indictment. The indictment named Davis in four counts: conspiracy to distribute narcotics (Count 1); intentional killing of Robert Parker (Count 3); killing of a witness (Count 4); and possession of cocaine (Count 58). The indictment named Cooper in a majority of the 62 counts. Following the voluntary dismissal of several counts and the filing of a superseding indictment, Cooper was charged as follows: one count of conspiracy to distribute narcotics (Count 1); one count of engaging in a continuing criminal enterprise (Count 2); one count of intentionally inducing the killing of Robert Parker (Count 3); one count of causing the killing of a witness (Count 4); one count of soliciting the murder of a witness, Henry Leon Harris (Count 7); five counts of possession with the intent to distribute cocaine and heroin (Counts 25, 26, 41, 43, & 46);

---

* The Honorable Michael M. Mihm, Chief District Judge for the Central District of Illinois, is sitting by designation.

four counts of distribution of cocaine and heroin (Counts 6, 18, 29, & 37); twenty-four counts of using the telephone to facilitate a federal felony (Counts 9–14, 17, 20–23, 27, 28, 32–35, 39, 40, 42, 44, 45, 47, & 48); three counts of persuading grand jury witnesses to evade legal process (Counts 49, 50, & 53); two counts of hindering others from communicating with law enforcement officers (Counts 51 & 52); one count of making false statements to secure a passport (Count 54); one count of attempting to prevent the testimony of witnesses (Count 59); and two counts of making false statements on tax returns (Counts 61 & 62).

On May 10, 1990, the government filed a notice of intent to seek the death penalty against Cooper and Davis for Counts 2 and 3, pursuant to 21 U.S.C. § 848.

On January 7, 1991, the district judge ordered separate trials for Cooper and Davis.

On March 7, 1991, the jury in Cooper's trial found him guilty of all counts charged with the exception of a not-guilty finding on Count 23 and no finding as to Count 4. The trial court held a death-penalty hearing pursuant to 21 U.S.C. § 848(g), and on March 15, 1991, the jury did not unanimously find that the court should sentence Cooper to death. On March 19, 1991, the district court sentenced Cooper to: 20 years for Counts 7, 18, 25, 29, 36, 37, 41, 43, and 46; 10 years for Counts 49–53, and 59; 5 years for Count 54; 4 years for Counts 9–14, 17, 20–22, 27, 28, 32–35, 39, 40, 42, 44, 45, 47, and 48; 3 years for Counts 61 and 62; and life imprisonment for Counts 1, 2, and 3 of the second superseding indictment.

On September 25, 1991, the jury in Davis's trial found him guilty on all four counts. The trial court held a death-penalty hearing, and on October 17, 1991, the jury did not unanimously find that the court should sentence Davis to death. On February 3, 1992, the district judge sentenced Davis to life imprisonment for Counts 1, 3, and 4 and to 20 years imprisonment for Count 58 of the second superseding indictment.

On November 22, 1991, Cooper filed a timely notice of appeal, and on February 11, 1992, Davis filed a timely notice of appeal.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

On appeal Cooper raises one issue: whether the trial court properly found that Davis failed to establish a *prima facie* case that the prosecutor had exercised peremptory challenges of black jurors on the basis of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Davis presents five questions for appeal: (1) did the government's exercise of peremptory challenges to exclude four black potential jurors violate the Equal Protection Clause pursuant to *Batson*; (2) should the trial court have suppressed statements made by Davis to Agent Richard Ludowig; (3) was an ammunition box illegally seized during a search; (4) was the evidence presented at trial insufficient to sustain Davis's convictions on Counts 3 and 4 of the indictment; and (5) was 21 U.S.C. § 848(e)(1) improperly applied to the facts of this case. The Court answers the question raised by Cooper in the affirmative, but answers the questions raised by Davis in the negative. The Court affirms the convictions of both Cooper and Davis.

## I. BATSON v. KENTUCKY

In *Batson v. Kentucky*, the Supreme Court set forth a three-step framework for evaluating claims that a party opponent had used peremptory challenges during jury selection in such a manner as to violate the Equal Protection Clause. First, the objecting party must establish a *prima facie* case that peremptory challenges were used to exclude a prospective jury on the basis of race. *Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1722–23. Second, once a *prima facie* case is established, the burden shifts to the government to articulate a racially-neutral explanation for striking the particular juror in question. *Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723–24. Third, the trial court must determine whether the objecting party has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1723–24. *See also Hernandez v. New York*, 500 U.S. 352, 357–60, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991) and *United States v. Chandler*, 12 F.3d 1427 (7th Cir.1994).

■ To establish a *prima facie* case of purposeful discrimination under *Batson*, the objecting party must demonstrate: (1) that he is a member of a cognizable racial group; (2) that the government used a peremptory challenge to remove from the venire a member of a cognizable racial group; and (3) that the facts and any other relevant circumstances raise an inference that the opposing party used the peremptory challenge to exclude the venireperson on account of that person's race. *United States v. Ferguson*, 935 F.2d 862, 864 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 907, 116 L.Ed.2d 807 (1992), *citing Batson*, 476 U.S. at 96, 106 S.Ct. at 1723.

The district judge conducted jury selection in the separate Cooper and Davis trials in two stages. He first screened potential jurors by questioning consistent with *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). At that stage he asked two questions addressing whether the potential juror would find the death penalty appropriate under any circumstances and whether the potential juror felt the death penalty should always be imposed when available. He then went on to conduct the customary *voir dire* inquiries into the backgrounds and attitudes of the potential jurors. Pursuant to Rule 24(b), each party had twenty peremptory challenges. Fed.R.Crim.P. 24(b).

### A. Cooper Case

■ Cooper objected to the government's use of peremptory challenges excluding potential jurors Smith and Johnson, both black. The government made the strikes against Smith and Johnson at stage two of the jury selection process. At the time the strikes were made, thirty-seven venirepersons had been interviewed as potential petit jurors. Of those thirty-seven, eight were black. Ten of those interviewed had already been selected for the petit jury. Of those ten jurors, four were black.

The district judge initially denied Cooper's request for a *Batson* hearing in chambers and out of the presence and hearing of the jury. In his written memorandum opinion filed later in conjunction with his ruling on post-trial motions, the district judge justified his ruling in part on the fact that the government had not objected to the four black jurors who had been selected prior to the exercise of the first of the two peremptory challenges, and in part on the fact that the government had accepted several other black venirepersons who were stricken by Cooper's peremptory challenges. The district judge also considered the statistical facts that approximately 25% of the total venire were black, that the government used two peremptory challenges to strike 25% of the black persons making up the venire, and that when the strikes were made 40% of the jurors already selected were black. The facts showed that the government had peremptory challenges available but did not strike black venirepersons early in the jury selection process. In this case the Defendant was black, the victim was black, and most of the government witnesses were black. The district judge wrote that he had considered all the relevant circumstances and concluded that there was no inference of discriminatory purpose that could have even approached a *prima facie* case for purposeful discrimination. This Court finds nothing in the record which suggests that the district court erred in making that finding.

■ The objecting party carries the burden of establishing a *prima facie* case under *Batson*. Cooper gave no details as to why the government's challenges were improper. While any of the above facts standing alone might not defeat the finding that a *prima facie* case existed, the facts in this record do nothing to raise an inference of racial discrimination. To establish a *prima facie* case for purposeful discrimination under *Batson*, Cooper must do more than merely point to the fact that the government excluded two black venirepersons by using peremptory challenges. Cooper must point to facts and circumstances raising an inference that the potential jurors were excluded because of race. Otherwise, every peremptory challenge used to exclude any cognizable minority from a petit jury would require a *Batson*-type hearing.

This Court affirms the district court's finding that Cooper failed to establish a *prima*

*facie* case for purposeful discrimination under the *Batson* analysis.

### B. Davis Case

■ In the Davis case, the government volunteered a racially-neutral explanation for using four peremptory challenges to strike black venirepersons. Where the government volunteers a race neutral explanation for exercising peremptory challenges and the trial court goes on to rule on the ultimate issue of whether the race neutral reason was really a pretext for discrimination, the issue of whether the challenging party has established a *prima facie* case is moot. *Hernandez*, 500 U.S. at 358–60, 111 S.Ct. at 1866.

■ At step two of the *Batson* framework, the issue becomes the facial validity of the defending party's explanation. The Supreme Court defines a racially-neutral explanation as an "explanation based on something other than the race of the juror." *Hernandez*, 500 U.S. at 360, 111 S.Ct. at 1866. The explanation needs only to be "clear and reasonably specific, presenting legitimate reasons that are related to the particular case," *United States v. Nichols*, 937 F.2d 1257, 1262 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 989, 117 L.Ed.2d 151 (1992), and "need[s] not rise to the level of justifying exercise of a challenge for cause." *Nichols*, 937 F.2d at 1262, *quoting Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723. A trial court may not find that the defending party violated the Equal Protection Clause at this stage and must accept the proffered explanation for the venireperson's exclusion as racially-neutral unless the explanation inherently exposes a discriminatory intent. *Hernandez*, 500 U.S. at 358–60, 111 S.Ct. at 1866. The trial court must also assume that the proffered reasons for making the peremptory challenge are true. *Hernandez*, 500 U.S. at 358–60, 111 S.Ct. at 1866.

■ At step three, the trial court must evaluate the racially-neutral explanation and determine whether the peremptory challenge violated the Equal Protection Clause as a matter of law. In order to establish a violation, the trial court must find racially discriminatory intent or purpose as a matter of fact on the part of the offending party. *Her-*

*nandez*, 500 U.S. at 358–60, 111 S.Ct. at 1866, 1868. The Supreme Court has stated that discriminatory purpose implies that the offending party acted, at least in part, "because of" the adverse effects his action would have upon an identified group. *Hernandez*, 500 U.S. at 358–60, 111 S.Ct. at 1866. Discriminatory purpose may be inferred from the totality of the relevant facts and a finding that the government's stated racially-neutral reasons were a mere pretext for discrimination. *Hernandez*, 500 U.S. at 362–64, 111 S.Ct. at 1868.

■ On appeal, the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact and will not be overturned unless clearly erroneous. *Hernandez*, 500 U.S. at 368–69, 111 S.Ct. at 1871; *United States v. Hughes*, 970 F.2d 227, 230 (7th Cir.1992); and *United States v. Mojica*, 984 F.2d 1426, 1449 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).

### The Four Peremptory Challenges

1. *Michael Bolton.* Michael Bolton was the first black member of the venire against whom the government exercised a peremptory challenge. The government proffered two reasons for excluding Bolton. First, the government stated that Bolton's answer to the district judge's initial *Witherspoon* question indicated that Bolton would have difficulty voting for the death penalty in any case. Bolton said, "That's a sensitive question; something to think about." When pressed for a direct answer by the district judge, Bolton asked, "You need a yes or a no answer?" After being asked the question for a third time, Bolton responded, "There are circumstances and if they're presented properly, I'd search the facts and everything else, I would say, yes."

Second, the government believed that Bolton would be an unreliable and inattentive juror. The government stated that "throughout the entire jury selection process, [Bolton] appeared to be bored and disinterested." The government also noted that Bolton had arrived 40 minutes late for one court session without explanation or apology.

2. *Pauline Simmons.* The government's explanation for striking Pauline Simmons was that she appeared to be headstrong and could disrupt the jury's deliberative process. They based this reasoning on Simmons's volunteered statement to the court that she was "pretty well read on a great deal of subjects." The government stated that this statement suggested that Simmons appeared to be a "know-it-all." They also expressed the concern that Simmons might be sympathetic toward the Defendant because she had several children approximately the same age as the Defendant.

3. *Elizabeth Reames.* The government's explanation for excluding Elizabeth Reames was similar to the explanation used for excluding Bolton, that is, her response to the district judge's initial *Witherspoon* question. Reames had stated, "I wouldn't say I would never." The district judge inquired further, asking if there could be circumstances under which she would vote to impose the death penalty, and Reames's inclusive response was, "I could but—." One of the government prosecutors also noted that Reames "sighed" when addressing the issue, suggesting that she had great difficulty with the prospect of ever applying the death penalty.

4. *Evangeline Fletcher.* On appeal, neither party addresses the government's exclusion of Evangeline Fletcher.

■■■ Davis argues that the government's explanations for striking the above venirepersons were wholly subjective, and that without some objective verification, the *Batson* framework for establishing purposeful discrimination will effectively render such challenges meaningless and unenforceable.

■■■ The ultimate issue in a *Batson* challenge turns on a factual finding of discriminatory intent. *Hernandez,* 500 U.S. at 368–69, 111 S.Ct. at 1871; *Hughes,* 970 F.2d at 230; and *Mojica,* 984 F.2d at 1449. The *Batson* framework properly positions the focus in making such an ultimate decision upon the trial court. The trial court must weigh the defending party's racially-neutral explanation and consider all other relevant facts to determine whether the explanation was a mere pretext or not.

In addressing the issue of deference given to a trial court's factual findings, the Supreme Court has indicated that the decisive question in "the typical peremptory challenge inquiry ... will be whether counsel's race-neutral explanation ... should be believed." *Hernandez,* 500 U.S. at 364–65, 111 S.Ct. at 1869. At step three of the *Batson* framework, in determining the issue of state of mind, the trial judge sits as a neutral observer making credibility evaluations and assessing the demeanor of the challenged venireperson and the attorney/party who exercised the challenge.

This Court rejects Davis's argument that objective verification should be required to buttress subjective race-neutral explanations at step two of the *Batson* framework. The reasons given for the exercise of a peremptory challenge must simply be race-neutral. The burden remains with the challenging party to show purposeful discrimination.

Unlike the reviewing court, a trial judge sits in a position to witness the relevant evidence first hand. The trial judge can assess the tone of voice, the body language, the facial gestures, and the overall countenance of potential jurors and trial counsel in evaluating these matters. Judgments of credibility in cases like this depend on assessments which cannot be made by the reviewing court.

This Court is convinced that the district judge did a thorough and diligent job in this case. The record shows that he considered the justification for each venireperson's exclusion and defendant's response before determining that the government's proffered explanations were reasonable and credible. He also juxtaposed his own assessment of the excluded venireperson with the reasons proffered by the government. For example, he recalled that juror Reames was one of those persons who gave a sort of very reluctant qualifying answer to the first *Witherspoon* question and noted in his observance of juror Simmons's demeanor that the prosecutor's interpretation of her statement was reasonable.

The trial judge sits in the unique position to make credibility assessments of the ac-

tions of trial attorneys. In some cases, such as here, the judge has had the opportunity to observe patterns and practices of particular attorneys during prior jury selections. *See United States v. Williams*, 934 F.2d 847, 850 (7th Cir.1991). The district judge in this trial specifically addressed his prior experiences with the government prosecutors in assessing whether their proffered reasons were credible. He noted that his prior experience with these prosecutors buttressed his conclusion that race played no part in their selection of the Davis jury.

This was the first death penalty case brought under § 848 in the Northern District of Illinois and that jury selection took several days. The transcript shows that Judge Shadur took every precaution during the entire jury selection process, beginning with the *Witherspoon* questioning, to see that the proper procedures were followed.

The district court's findings on the *Batson* issue are affirmed.

## II. MOTIONS TO SUPPRESS

### A. Davis's Statement to Agent Richard Ludowig

▐ Davis moved the trial court for suppression of certain statements Davis made following his arrest to Agent Richard Ludowig during processing. Davis based his motion on the grounds that the statements were not volunteered, but rather were made in response to Agent Ludowig's prompting in the course of a dialogue. The district court denied the motion finding that Davis was not being "interrogated" as that term is defined in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

▐ In *Innis*, the Supreme Court held that interrogation

refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689–90.

Where an objective observer would believe that the encounter was reasonably likely to elicit an incriminating response from the defendant, the court will find that the encounter constituted the "functional equivalent" of interrogation. *Innis*, 446 U.S. at 300–01, 100 S.Ct. at 1689–90. Voluntary statements, however, are admissible and not subject to the Miranda warnings, unless the statements are the result of compelling influence. *Innis*, 446 U.S. at 299–300, 100 S.Ct. at 1689, *quoting Miranda*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). The question of which party encouraged the dialogue between the police and the accused plays an indicative role in the determination of whether the statement was the result of compelled influence. *Arizona v. Roberson*, 486 U.S. 675, 681, 108 S.Ct. 2093, 2097, 100 L.Ed.2d 704 (1988).

The facts here indicate that Davis initiated the conversation. On March 24, 1990, during processing, Davis told Agent Ludowig that he did not know he was wanted and did not kill anyone. Davis added, "You'd better have some witnesses." Agent Ludowig responded that "They sure did." Agent Ludowig also replied to Davis that "[he] would get a chance if he so desired to do the right thing and to cooperate." Davis then replied, "Don't treat me like those holes who were talking. Go ahead and move them out of state. They will get theirs." The prosecutor sought to admit these statements as relevant to show consciousness of guilt.

Davis cites to *United States v. Gomez*, 927 F.2d 1530 (11th Cir.1991), for the proposition that an officer's statements encouraging cooperation constitutes the functional equivalent of interrogation. The *Gomez* case, however, involved a DEA agent's disclosure to the defendant of the impact of mandatory minimum sentencing and the benefits of cooperating with the police. Arguably, the DEA agent's statements would tend to compel or at least be likely to elicit a response. The facts of *Gomez*, however, do not equate to the exchange between Davis and Agent Ludowig in the instant case. Agent Ludowig's reference to cooperation was prospective and did not follow threats of what would happen to Davis if he did not cooperate.

This Court finds that Davis's statements were freely and voluntarily offered and that nothing functionally equivalent to interrogation occurred in the exchange. *See e.g., Innis,* 446 U.S. at 295, 100 S.Ct. at 1687 (no interrogation where police officer, in the presence of defendant, said to someone other than defendant "there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves," and defendant made incriminating statements); *United States v. ·Taylor,* 985 F.2d 3, 6 (1st Cir.1993) (no interrogation where police arrested and transported suspect who said "Why is this happening to me?" Officer replied, "You can't be growing dope on your property like that," and suspect then made incriminating statement); *United States v. Payne,* 954 F.2d 199, 201 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1680, 118 L.Ed.2d 396 (1992) (no interrogation where police officer told suspect "They found a gun at your house," and suspect then made incriminating statement); and *United States v. Henderson,* 770 F.2d 724, 727 (8th Cir.1985) (no interrogation where police officer said, "Well, you had the pipe and you certainly scared him. .You made him fear for his safety," and the defendant made an incriminating statement).

### B. The Empty Ammunition Box

On July 24, 1989, five.months following Parker's murder, Chicago police officers obtained a search warrant for Davis's apartment based on information that cocaine had been purchased from Davis at the apartment. During the search, the officers seized various drugs, drug paraphernalia, and weapons. The officers also seized an empty .380 caliber ammunition box. Prior to trial, Davis sought the suppression of the ammunition box on the grounds that the officers lacked probable cause to believe the box was evidence of any crime. The ammunition box was not of the same caliber as the weapons seized during the search. The box was found empty in the same room with several weapons and with pictures of Davis holding various weapons. It was specifically located in a bedroom dresser drawer containing various papers and clothing. The government argued that the seizure of the box fell under the plain view doctrine because the box would be readily recognized as an incriminating "tool of the drug trade" in that it could be inferred that it was once full of ammunition. The district court denied the motion to suppress, reasoning that the box was relevant to show that Davis was dealing drugs.

Davis argues that the incriminating character of an empty ammunition box is not immediately evident and is no more incriminating than a cigar box used to store children's pencils. The government must establish probable cause for a seizure to invoke the "plain view" exception to the ·warrant requirement. *Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).

This Court has previously held that weapons are "tools of the trade" of drug dealers, and the simultaneous possession of weapons and drugs supports an inference that .the suspect is dealing drugs. *United States v. Rush,* 890 F.2d 45, 49 (7th Cir.1989). Moreover, as the government correctly points out, the ammunition box was not discovered in a vacuum. Coupled with the seized drugs, weapons, and photographs, the ammunition box is probative of the use of weapons in connection with drug trafficking in violation of federal law. The ammunition box, unlike a cigar box, is probative of weapons possession and drug dealing. The empty ammunition box raises an inference that the contents had been used in a firearm. The district judge correctly stated that "you can't have one without the other." Evidence that Davis at one time possessed .380 caliber ammunition is incriminating in the same way that his possession of the weapons was incriminating.

In addition, Davis at the time of the search was a convicted felon, and thus, state and federal law prohibited him from possessing a firearm.· The detective who executed the search warrant was the same detective who had arrested Davis in 1985. Therefore, the detective had probable cause to believe that Davis had violated federal and state law by possessing a firearm, and. the ammunition box was probative of this violation.

Therefore, this Court affirms the district court's denial of Davis's motion to suppress the ammunition box.

### III. SUFFICIENCY OF THE EVIDENCE

■ A defendant who appeals a verdict based on the sufficiency of the evidence supporting his conviction carries a heavy burden. *United States v. Holland*, 992 F.2d 687, 689 (7th Cir.1993). This Court will uphold a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Campbell*, 985 F.2d 341, 344 (7th Cir.1993), *citing United States v. Burrell*, 963 F.2d 976, 987 (7th Cir.1992). When the record contains any evidence from which the trier of fact can find the defendant guilty beyond a reasonable doubt, a conviction will not be reversed, regardless of how the fact finder weighs that evidence. *United States v. Marren*, 890 F.2d 924, 933 (7th Cir.1989), *citing United States v. Colonia*, 870 F.2d 1319 (7th Cir.1989) and *United States v. Rollins*, 862 F.2d 1282 (7th Cir.1988), *cert. denied*, 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989). In other words, this Court will not "second-guess the jury ... unless the record is barren of any evidence supporting the government's case." *United States v. Anagnostou*, 974 F.2d 939, 944 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1943, 123 L.Ed.2d 649 (1993).

■ Davis argues that the government failed to establish the essential elements of the charge of killing Robert Parker beyond a reasonable doubt. Davis directs the Court to the testimony of such witnesses as Linda Johnson, Cavelle Benjamin, Deborah Pinkos, Joe Davis, and Angela Wilson to establish his whereabouts between 11:00 p.m. February 6th and 1:00 a.m. February 7th. He asserts that the testimony of these witnesses prove that he could not possibly have killed Parker because Parker was seen at Chicago's Doral Plaza at 10:30 p.m. and found dead at 708 West 116th Place at 11:45 p.m. on the 6th of February.

This Court, however, does not have to take a long or hard look into the record of this case to find sufficient evidence supporting Davis's conviction. Davis admits in his brief that this evidence contradicts the testimony of Renata Turner and Keith Brooks, who testified for the government at the trial. Turner testified that she saw Davis leave the Stop Restaurant with Parker at about 9:25 or 9:30 p.m. She also testified that Davis returned to the restaurant at 12:29 a.m. without Parker. Brooks testified that Davis, while incarcerated with him at the Metropolitan Correctional Center pending trial, admitted to Brooks on several occasions that he had shot Parker.

Davis attempts to discredit the testimony of Turner and Brooks. It is up to the jury, however, to determine the credibility of the witnesses and not the appellate court. *United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir.1989).

### IV. 21 U.S.C. § 848(e)(1)

■ Count 3 of the second superseding indictment charged Davis with the intentional killing or counseling, commanding, inducing, or causing the intentional killing of Robert Parker "while working in furtherance of a continuing criminal enterprise," in violation of 21 U.S.C. § 848(e)(1)(A). Davis argues that § 848(e)(1) cannot apply to the facts of this case because he was not dealing drugs or committing any substantive drug offense at the time he allegedly killed Parker. He asserts that the statute requires some direct connection between the killing of Parker and a drug transaction.

He premises his argument on an assertion that § 848(e)(1) applies only to drug kingpins involved in significant drug activities. He bases his interpretation on the language, "engaged in a continuing criminal enterprise," used in subsections (a), (b), and (c). Davis points out that he was charged with "working in furtherance of" as opposed to "engaged in" a continuing criminal enterprise. The statute defines the phrase "engaged in." The statute does not, however, define "working in furtherance of." Based on the foregoing, Davis argues that to apply the murder of an informant/witness by someone other than a drug kingpin and someone not involved in

any drug transaction relating to a continuing criminal enterprise at the time of the murder would be to extend the application of the statute beyond its statutory context. This Court disagrees.

The language "working in furtherance of" first appears at subsection (e)(1) of the statute pertaining to the death penalty. That subsection reads, "any person engaging in or working in furtherance of a continuing criminal enterprise...." If the Court were to read the statute as narrowly as Davis suggests, the "working in furtherance" portion of the statute would be superfluous and without substantive meaning. The facts indicate that Davis held a position close to the top of a sophisticated drug trafficking hierarchy, that Cooper, the so-called kingpin of the criminal enterprise, confided in and relied on Davis for carrying out the business of drug trafficking, that Parker threatened the future of the enterprise and its members, and that Davis killed Parker at the behest of Cooper to preserve the enterprise.

The statute expressly refers to "any person ... working in furtherance of a continuing criminal enterprise ... who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual...." 21 U.S.C. § 848(e)(1)(A). When Davis shot Parker, he did it to further the interest of a continuing criminal enterprise.

Davis also argues that the term "working in furtherance of a continuing criminal enterprise" is unconstitutionally vague because of congressional failure to provide a definition for the term.

Absent any statutory definition, a term should be given its commonly understood meaning. *United States v. Locke,* 471 U.S. 84, 95, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985). Furtherance means "act of furthering, or helping forward; promotion; advancement; progress." Webster's New International Dictionary, 2d Ed. (1976); and Black's Law Dictionary, (5th ed. 1981). The district judge stated that "in furtherance" is a phrase familiar in criminal law. In Rule 801(d)(2)(E) of the Federal Rules of Evidence, a co-conspirator's statement made during the course of and in furtherance of a conspiracy is excluded from the definition of hearsay.

Consistent with its common meaning, working "in furtherance" of a continuing criminal enterprise means working to promote or advance the interests of a continuing criminal enterprise. This Court finds nothing unconstitutionally vague about this language.

## V. CONCLUSION

For the foregoing reasons, the convictions of Alexander Cooper and Anthony Davis are AFFIRMED.