2000 SD 128

**Cirilo RODRIGUEZ, Applicant and Appellant,**

v.

**Doug WEBER, as the duly appointed Warden of the South Dakota State Penitentiary, and Robert Dooley, Warden of the Springfield State Prison, Appellee.**

No. 21264.

Supreme Court of South Dakota.

Considered on Briefs May 30, 2000.

Decided Sept. 13, 2000.

Gordon D. Swanson of Hansen, Hubbard & Swanson, Sturgis, Attorneys for applicant and appellant.

Mark Barnett, Attorney General, Frank Geaghan, Assistant Attorney General, Pierre, Attorneys for appellees.

KONENKAMP, Justice

[¶ 1.] Cirilo Martin Rodriguez was convicted of felony possession of marijuana and sentenced to ten years in the penitentiary after a traffic stop and search of the vehicle he was driving uncovered over ninety-four pounds of marijuana in a hidden compartment. In his application for a writ of habeas corpus he contended, among other things, that his trial attorney was ineffective. A urine sample taken after his arrest proved there was no trace of marijuana in his body, but the State failed to disclose this result, and his lawyer, who knew of the test but not the result, failed to pursue it. Other than Rodriguez, trial counsel called no witnesses in support of Rodriguez's claim that he was an innocent dupe in a scheme to transport illegal substances. Habeas relief was denied and he now appeals on multiple grounds, including the failure to disclose the results of the urinalysis, and the denial of effective assistance of counsel. We affirm, as we conclude that there is no reasonable probability that the outcome of the trial would have been different had the errors not occurred.

## Background

[¶ 2.] On February 19, 1996, Rodriguez was eastbound on I–90 about five miles east of the Wyoming–South Dakota border. He was driving alone in a 1982 Chevrolet Blazer bearing Washington State license plates. Highway Patrol Trooper Michael Shafer stopped him for speeding. Rodriguez produced an Illinois driver's license issued on December 5, 1995, with the name Cirilo Martin Rodriguez. The vehicle registration showed the owner as Andres Sanchez Lopez of Pasco, Washington. Shafer asked Rodriguez to come back with him and take a seat in his patrol car.

[¶ 3.] Trooper Shafer noticed a bulge in Rodriguez's pocket. When asked what it was, Rodriguez said it was a pager. It was a leased satellite-linked sky pager. He claimed he carried the pager all the time so that his family could contact him. It was later learned that it had been rented only two days earlier, not in the name of Cirilo Rodriquez, but in the name Maria Cuevas, who Rodriquez later said was the wife of a friend. Expert testimony at trial disclosed that those involved in the drug trade often use these pagers to communicate without being traced.

[¶ 4.] Trooper Shafer asked about the person named on the vehicle registration. Rodriguez said Lopez was his brother-in-law and that he was buying the Blazer from him. Rodriguez explained that he was returning to his home in Chicago, Illinois, from a weeklong visit with his brother-in-law in Pasco. He was unable to tell Shafer in what part of Washington Pasco was located, indicating that his brother-in-law had picked him up at the airport and had taken him there. Shafer asked Rodriguez what airport he had flown into, and Rodriguez said, "Washington, D.C." When told that Washington, D.C. is on the eastern seaboard, Rodriguez thought it must have been the airport in Seattle instead. Again Shafer asked about

the owner of the Blazer. Rodriguez then declared that he did not know Lopez and that his brother-in-law, Fernando Lara, had "all the papers" on the vehicle. Rodriguez said, "I buy it for him!" referring to Lara.

[¶ 5.] Some of Rodriguez's communication difficulties can be ascribed to his inability to converse well in English. But even repeated questions for clarification only revealed more incongruities. Shafer became suspicious that Rodriguez was a drug courier. After telling Rodriguez that he would be free to go once a warning ticket was written, and then issuing the ticket, Shafer asked if Rodriguez minded if he asked a few more questions. Rodriguez said "Sure." Shafer asked him if he was transporting any guns or narcotics in the vehicle. Rodriguez said "No." Trooper Shafer told Rodriguez, "I'm gonna be honest with you, I'm suspicious." Rodriguez responded, "Do you want to check the vehicle, go ahead." Shafer asked several more questions to be certain Rodriguez understood he was giving permission to search the vehicle, and Rodriguez said, "Go ahead."

[¶ 6.] During the search of the Blazer, Shafer found indications that it was being used to transport drugs, including a roll of duct tape, a container of carpet freshener (often used to mask the pungent odor of marijuana), and signs of a hidden compartment. This compartment appeared to be accessible from underneath the floorboard carpeting. Shafer walked over to Rodriguez and advised him that "there had been some alterations in his vehicle, and asked if there was a compartment in his vehicle." Rodriguez's demeanor changed: he became more nervous, jittery; his voice cracked.

[¶ 7.] Shafer, along with another trooper who had just arrived, ripped out the carpet to find a cutout in the floorboard. They discovered that the fuel tank had been modified so that part of the area ordinarily occupied by the tank had been refitted, creating a container within a container.

Thus the gas tank appeared normal to an untrained eye when looking from underneath the vehicle. Trooper Shafer, however, had noticed amateur welds in the gas tank area. The officers retrieved from the hidden compartment thirty-six individually wrapped packages, cumulatively holding just over ninety-four pounds of marijuana. The marijuana had evidently been machine-compressed into extremely hard brick-like forms. The bricks were wrapped in duct tape, and coated with oil. In this condition, the illegal substance was calculated to have a value of $100,000. And once reprocessed and packaged for individual sales, its estimated value increased to $300,000.

[¶ 8.] Rodriguez was indicted on the charge of possession of more than ten pounds of marijuana, in violation of SDCL 22-42-6. At trial, his defense was that he did not know the marijuana was in the vehicle. He was "duped," his lawyer said, "by Fernando Lara, who left him then high and dry." Through a translator, Rodriguez told the jury that he met Fernando Auturo Lara in a park in Ontario, California. Lara was moving to Chicago and needed someone to drive one of his two vehicles. Temporarily out of work, Rodriguez volunteered to help. He was not promised any specific pay. Lara said he would fly Rodriguez back to California and give him "something." Lara, his wife, and Rodriguez alternated driving the Blazer and the other vehicle. The day before they arrived in South Dakota they had spent the night in Santa Fe, New Mexico. Rodriguez testified that when Trooper Shafer stopped him, Lara and his wife passed them and just drove on. Rodriguez explained to the jury that he lied to Officer Shafer because Lara told him to, but he did not know why Lara told him to lie. He assumed it was because the vehicle title had not yet been formally transferred. Despite efforts by the South Dakota DCI, Highway Patrol, and Attorney General, the true ownership of the Blazer could not be traced.

[¶ 9.] Other details in Rodriguez's background proved irregular. He had used different dates of birth and different social security numbers. At the time he was stopped, three active driver's licenses were shown as issued to him. One was a license from Illinois, issued December 5, 1995, showing a date of birth of April 15, 1960. Two were California licenses. One showed a date of birth of April 15, 1965. The other was under an assumed name, Miguel Alvizo Rodriguez, date of birth September 29, 1960, issued on June 29, 1992. In the past, license plates had been issued on a vehicle in New Mexico under this false name.

[¶ 10.] Rodriguez, age thirty-one at the time of trial, said that he obtained different identifications in part to evade immigration authorities because he came to this country illegally at age fourteen. Yet he was issued a "green card" (conferring resident alien status) in 1987 making his presence here legal from that time on. When asked why he got a driver's license in 1992 under a false name, he answered, he "just had it ... never used it.... Just to have it."

[¶ 11.] After a jury trial, he was found guilty of the charge and was sentenced to ten years in the state penitentiary. On direct appeal, his conviction was summarily affirmed. *See State v. Rodriguez,* 570 N.W.2d 246 (S.D.1997). Rodriguez then filed an application for a writ of habeas corpus, listing ten separate grounds for relief. The circuit court denied the application. Rodriguez now appeals that denial, asserting the following issues: (1) Did the State's failure to disclose a negative urinalysis result violate Rodriguez's right to due process of law? (2) Did the State's use of a peremptory challenge to remove a juror of Mexican descent violate Rodriguez's right to a trial by a fair and impartial jury? (3) Was Rodriguez denied his constitutional right to effective assistance of counsel?

**Analysis and Decision**

[¶ 12.] Habeas corpus is a collateral attack on a final judgment, and therefore our scope of review is limited. *Lodermeier v. Class,* 1996 SD 134, ¶ 12, 555 N.W.2d 618, 621. A habeas applicant bears the initial burden to establish a colorable claim for relief. *Jenner v. Dooley,* 1999 SD 20, ¶ 11, 590 N.W.2d 463, 468. Accordingly, the State has only the burden of meeting the petitioner's evidence. *Davi v. Class,* 2000 SD 30, ¶ 26, 609 N.W.2d 107, 114. The habeas court's factual findings are reviewed under the clearly erroneous standard, while legal conclusions are reviewed de novo. *Meinders v. Weber,* 2000 SD 2, ¶ 5, 604 N.W.2d 248, 252 (citations omitted).

### 1. Failure to Disclose Negative Urinalysis

[¶ 13.] Sometime after his arrest, Rodriguez provided a urine specimen for analysis. Although trial counsel had filed a motion for discovery of any scientific test results, the urinalysis (UA) result was not provided. Rodriguez argues that his rights under both the United States and the South Dakota constitutions were violated by the State's failure to disclose his negative UA. As the result was exculpatory evidence, he contends, the State's suppression of it violated due process. To Rodriguez the result proved that he was not using drugs. The habeas court concluded that the test result was neither exculpatory nor material because proof that Rodriguez did not use drugs had no tendency to disprove knowing possession of such a large amount of marijuana.

[¶ 14.] Due process under the Fourteenth Amendment of the United States Constitution, and Article VI, § 2 of the South Dakota Constitution, requires the State to reveal exculpatory evidence to the defense. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963); *State v. Hanson,* 278 N.W.2d 198, 200 (S.D.1979). We use a four-part test to decide whether a due

process violation occurred when the State fails to disclose evidence. *Black v. Class*, 1997 SD 22, ¶ 16, 560 N.W.2d 544, 548 (citations omitted). If all four of the following elements are established, then the court must grant a new trial:

1. Was the defense unaware of the evidence?
2. Is the evidence favorable to the defense?
3. Is the evidence material to the defense?
4. Did the defense make a request for the evidence?

*Id.* (citations omitted).

[¶ 15.] Under the first question, Rodriguez asserts that defense counsel was unaware of the negative result of the UA during the criminal proceedings. However, Rodriguez knew that he had given a urine sample and made his counsel aware of that fact. Testimony in the habeas hearing verified that counsel was aware at the time of trial that a UA had been performed. "If a defendant knows or should know of the allegedly exculpatory evidence, it cannot be said that the evidence has been suppressed by the prosecution." *State v. Wilde*, 306 N.W.2d 645, 647 (S.D.1981)(citing *United States v. Brown*, 628 F.2d 471, 473 (5thCir.1980)). The *Brady* rule requiring disclosure does not abrogate the responsibility of the defense to discover and develop evidence. *Id.* Rodriguez had notice of the essential facts that would have permitted him to take advantage of the allegedly exculpatory evidence. *See id.* The first element has not been met, and as all four inquiries must be answered affirmatively, this disposes of the issue. Nonetheless, we examine the remaining questions.

[¶ 16.] Addressing the second and third questions, Rodriguez argues that the results from the test were both favorable and material to his defense. In his view, people involved in drug trafficking are more likely to use illegal drugs, and the negative result would have been useful to

distance himself from the marijuana found in the Blazer, especially as his defense was lack of knowledge. He points to our decision in *State v. Buchholz*, 1999 SD 110, 598 N.W.2d 899, where we discussed the seizure of the defendant's urine for the purpose of having it tested for the presence of drugs after methamphetamine and drug paraphernalia were found in the defendant's vehicle. There, although the question before us was the constitutionality of the seizure, we explained that Buchholz's positive UA tended to show a knowing possession of drugs. *Id.* ¶ 24, 598 N.W.2d at 904.

[¶ 17.] *Buchholz* can be distinguished. In that case, the drugs and paraphernalia were found in a fanny pack in the defendant's vehicle. *Id.* ¶ 4, 598 N.W.2d at 901. The nature of the items found suggested that they belonged to a user, as opposed to simply a transporter. In that situation, the presence of drugs in the defendant's body would tend to show that the items were knowingly in her possession. We discussed the use of a positive UA as well in *State v. Hanson*, 1999 SD 9, 588 N.W.2d 885. There, evidence of a positive UA for drug consumption was crucial to establishing the defendant's knowing possession of marijuana as distinct from the two other occupants of the vehicle where the drugs were found. 1999 SD 9, ¶ 40, 588 N.W.2d at 894.

[¶ 18.] Here, in contrast, Rodriguez was transporting ninety-four pounds of marijuana. Trooper Shafer did not report that he detected the odor of burnt marijuana in the Blazer. No marijuana and no drug paraphernalia were found in the passenger area of the vehicle, nor were there any indications that Rodriguez was under the influence of any substance. More important, the amount and condition of the marijuana found in the hidden compartment suggested that it was not ready for immediate personal use. It was compressed into hard bricks and securely wrapped, so it obviously was intended for further processing before it could be used.

[¶ 19.] "[E]vidence is favorable where it creates a reasonable doubt that did not otherwise exist ... [and] 'material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"' *Black*, 1997 SD 22, ¶ 18, 560 N.W.2d at 548 (quoting *State v. Fowler*, 1996 SD 79, ¶ 22, 552 N.W.2d 391, 395)(other citations omitted)(alterations in original). We conclude that the negative test result would not have created a reasonable doubt on knowledge of the presence of marijuana in the Blazer. One need not be a drug user to be a drug courier.

[¶ 20.] We think it highly unlikely that the result of the trial would have been different had the UA result been disclosed to the jury. The defense of lack of knowledge relied in great part on whether the jury found credible Rodriguez's explanation for how he came to be driving a vehicle with almost one hundred pounds of marijuana. His credibility came under considerable attack with evidence, for example, that he lied repeatedly when stopped for speeding, and in his words, lied only because someone told him to; that he had two driver's licenses issued in his name and one in an assumed name; that he obtained a license in an assumed name even when by his own rationale it was no longer necessary to do so; and that the pager he said he always carried had been rented only two days earlier. After so much evidence of dishonesty, proof that he had no illicit substances in his body at the time of his arrest creates no reasonable probability of a different result. Accordingly, the second and third prongs of the *Brady* test are not met. While the defense did make a request for the evidence by its motion for discovery, meeting the fourth element, because the other three questions cannot be answered affirmatively, there was no *Brady* violation. We affirm the habeas court's decision on this issue.

## 2. Improper Use of Peremptory Challenge

[¶ 21.] Rodriguez next asserts that his right to a fair and impartial jury was violated when the State used one of its peremptory challenges to strike the only prospective juror of Mexican descent. Rodriguez is also Mexican. The State counters that Rodriguez did not meet the required initial burden of proving the existence of purposeful discrimination. We examine the matter under the standard set in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and followed by this Court in *State v. Rhines*, 1996 SD 55, 548 N.W.2d 415. To prevail on a claim under *Batson*, a prima facie case of purposeful discrimination in the jury selection process must be proved.

[¶ 22.] In *Honomichl v. Leapley*, 498 N.W.2d 636 (S.D.1993) we explained that to establish a prima facie case, it must be shown that (1) the defendant is a member of a cognizable racial group; (2) the prosecution removed members of that racial group; and (3) circumstances raise the inference that the challenge was motivated by race. 498 N.W.2d at 638–39. The second element was modified by the United States Supreme Court in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). There, the Court held that the excluded juror and the defendant need not be of the same race for the defendant to object to race-based exclusion. *Id.* at 409, 111 S.Ct. at 1369, 113 L.Ed.2d at 424. "The race of the defendant and the race of jurors peremptorily challenged are now circumstances for the trial court to consider in determining whether defendant raised an inference that State used its peremptory challenges for race-based reasons." *Honomichl*, 498 N.W.2d at 639 (citations omitted). Once a defendant establishes a prima facie case of purposeful discrimination, the burden shifts to the State to present a race-neu-

tral explanation for the peremptory challenge.

[¶ 23.] Here, Rodriguez did not object at .the time the juror's name was stricken. The question whether the peremptory strike was purposefully discriminatory was also not raised in the direct appeal. *Batson,* however, requires a timely objection. *See Ford v. Georgia,* 498 U.S. 411, 422, 111 S.Ct. 850, 857, 112 L.Ed.2d 935, 948 (1991); *Ruff v. Armontrout,* 77 F.3d 265, 267 (8th Cir.1996); *Clark v. Newport News Shipbuilding and Dry Dock Co.,* 937 F.2d 934, 939 (4th Cir. 1991). "Unless the facts supporting the *Batson* claim are articulated at trial, 'they are lost to the record and appellate review becomes impossible.'" *Williams v. Calderon,* 48 F.Supp.2d 979, 997 (C.D. Cal. 1998) (citations omitted).

[¶ 24.] This matter may nonetheless be reviewed for plain error. SDCL 23A–44–15 (Rule 52(b)); *see United States v. Contreras–Contreras,* 83 F.3d 1103 (9th Cir.1996). Under an examination for plain error, "the defendant bears the burden of showing the error was prejudicial." *State v. Nelson,* 1998 SD 124, ¶ 8, 587 N.W.2d 439, 443 (citation omitted). We explained in *Nelson* what must be shown:

> Plain error requires (1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." We invoke our discretion under the plain error rule cautiously and only in "exceptional circumstances." Such circumstances may include cases in which "'a miscarriage of justice would otherwise result,'" i.e., a defendant is actually innocent.

*Id.* ¶ 8, 587 N.W.2d at ·443 (alteration in original)(internal citations omitted).

[¶ 25.] Because this is a habeas proceeding, Rodriguez must make a greater showing to establish plain error than if the matter had been raised on direct appeal. *Williams,* 48 F.Supp.2d at 997 (citing *Engle v. Isaac,* 456 U.S. 107, 134–35, 102 S.Ct. 1558, 71 L.Ed.2d 783, ·805 (1982))(other citations omitted). Rodriguez contends that the prosecutor's comments at trial suggest that he had a discriminatory state of mind. Rodriguez points to several occasions when the prosecutor asked potential jurors whether they spoke Spanish and whether those who reside in this country should be fluent in the English language. Rodriguez insists these questions show the prosecutor's discriminative intent.

[¶ 26.] A closer look at the voir dire shows that the questions were asked chiefly because Rodriguez used Spanish as his primary language, which required the use of an interpreter .during the trial. We conclude that Rodriguez has not established that the "fairness, integrity or public reputation" of the proceedings was seriously affected, and that unless this mistake is corrected, "a miscarriage of justice" would occur. *See Nelson,* 1998 SD 124, ¶ 7, 587 N.W.2d at 443. Moreover, Rodriguez has not shown that had the excused individual remained on the jury the outcome would have been different. Because Rodriguez has failed to meet his burden of showing prejudicial error, we affirm on this issue.

### 3. Ineffective Assistance of Counsel

[¶ 27.] Finally, Rodriguez argues that his constitutional right to the effective assistance of counsel was violated in multiple ways by both his trial and appellate attorneys.* He was represented by a court

---

* In addition to the grounds discussed in Part 3, Rodriguez also contends that (1) counsel was ineffective in not bringing to the attention of the court that law enforcement officers questioned him about the ownership of the Blazer

without notifying his attorney. He does not direct us to anything inculpatory gained during the questioning, however. Nor does he assert that anything obtained at this questioning was introduced at trial. Rodriguez has

appointed attorney in both the trial and the direct appeal. Thomas E. Adams was his trial counsel. After the sentencing, Rodriguez requested a change of attorney, and Thomas T. Zollinger was appointed to handle the appeal.

■ [¶ 28.] Rodriguez contends his trial attorney fell below the required standard of competence in several respects.

Whether a defendant has received ineffective assistance of counsel is essentially a mixed question of law and fact. In the absence of a clearly erroneous determination by the circuit court, we must defer to its findings on such primary facts regarding what defense counsel did or did not do in preparation for trial and in his presentation of the defense at trial. This court, however, may substitute its own judgment for that of the circuit court as to whether defense counsel's actions or inactions constituted ineffective assistance of counsel.

*Meinders*, 2000 SD 2, ¶ 42, 604 N.W.2d at 264 (quoting *Sund v. Weber*, 1998 SD 123, ¶ 14, 588 N.W.2d 223, 225)(other citations omitted). The petitioner has the burden of overcoming the strong presumption that counsel's performance was competent. *Sprik v. Class*, 1997 SD 134, ¶ 23, 572 N.W.2d 824, 829 (citations omitted). We will not second-guess the tactical decisions of trial counsel, but we "should not hesitate to reverse a conviction if the record reveals that a defendant was not afforded effective assistance of counsel." *New v. Weber*, 1999 SD 125, ¶ 7, 600 N.W.2d 568, 572 (quoting *Jones v. State*, 353 N.W.2d 781, 784 (S.D.1984))(citing *Grooms v. State*, 320 N.W.2d 149 (S.D.1982)).

■ [¶ 29.] We have adopted the test in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) for evaluating claims of ineffective assistance of counsel:

First, [the applicant] must prove that his trial counsel's performance was deficient. He must show that trial counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." Secondly, he must show that the deficient performance "prejudiced the defense" by showing that "counsel's errors were so serious as to deprive the defendant of a fair trial[.]" The reasonableness of trial counsel's action is evaluated from his perspective at the time the alleged error occurred.

*Meinders*, 2000 SD 2, ¶ 42, 604 N.W.2d at 264 (quoting *Sund*, 1998 SD 123, ¶ 13, 588 N.W.2d at 225)(alterations in original). Under the first prong of this test, where we employ an objective standard of reasonableness, counsel's errors must be "so serious that [he or she] was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Garritsen v. Leapley*, 541 N.W.2d 89, 93 (S.D.1995)(quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693). In the second prong of the test, we examine whether the result of the proceeding was fundamentally unfair or unreliable, not simply whether the outcome would have been different. *Rhines v. Weber*, 2000 SD 19, ¶ 15, 608 N.W.2d 303, 307 (citing *Siers v. Class*, 1998 SD 77, ¶ 12, 581 N.W.2d 491, 495)(other citations omitted). However, we are not

---

not established any prejudicial error. We also find the following arguments unmeritorious because either insufficient evidence was offered at the habeas hearing to support them or there was no prejudice shown: (2) Trial counsel was ineffective in failing to object to leaving the ninety-four pounds of marijuana in the courtroom during the trial. All of the marijuana had been admitted into evidence, however, and Rodriguez does not argue that it was erroneously admitted. (3) Trial counsel failed to object to Rodriguez not being released on a surety bond because of false information about an INS hold. A formal INS detainer was not put into place until approximately seven months after his arraignment. (4) Trial counsel was ineffective in failing to explore and preserve the issue of proportionality of sentence. (5) Appellate counsel was ineffective in failing to communicate with his client about possible issues that could be raised on appeal. (7) The cumulative effect of all counsel errors denied him effective assistance.

required to determine the sufficiency of counsel's performance before we review whether there was prejudice from the "alleged deficiencies." *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.; New*, 1999 SD 125, ¶ 7, 600 N.W.2d at 572. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700, 104 S.Ct. at 2071, 80 L.Ed.2d at 702. The habeas court ruled that Rodriguez failed to establish that Adams' performance was deficient and that any deficiencies in counsel's representation did not prejudice him.

#### a. *Failure to object to the removal of a juror*

■■■■ [¶ 30.] Rodriguez argues that the failure of attorney Adams to object to the State's exclusion of the only juror of Mexican descent on the panel supports his claim of ineffective assistance of counsel. Under the *Batson* standard, he must point to facts and circumstances that show that the potential juror was excluded because of race. "While it is true that striking a [minority] venireperson for racial reasons is always violative of the Constitution, it is not true that all peremptory strikes of [minority] venirepersons are for racial reasons." *Honomichl*, 498 N.W.2d at 639 (quoting *United States v. Lewis*, 892 F.2d 735, 736 (8th Cir.1989)). Rodriguez must do more than merely point out that the prosecution excluded a venireperson of Mexican descent with a peremptory challenge. *United States v. Cooper*, 19 F.3d 1154, 1159 (7th Cir.1994). He "must point to facts and circumstances raising an inference that the potential juror ' . . . [was] excluded because of race. Otherwise, every peremptory challenge used to exclude any cognizable minority from a petit jury would require a *Batson*-type hearing." *Id.* (alterations in original). As stated earlier, Rodriguez does not point to facts or cir-

cumstances during voir dire that show that the use of the peremptory challenge was race based. As such, counsel's failure to object was not an instance of professional deficiency. Furthermore, Rodriguez has not shown that the failure to object to the removal of this juror prejudiced him, that the outcome of the trial would have been different, or that it was fundamentally unfair or unreliable. His claim of ineffective assistance of counsel on this basis fails.

#### b. *Failure to obtain results of the urinalysis*

■■■ [¶ 31.] Rodriguez next argues that Adams' failure to obtain the exculpatory UA result was deficient. Attorney Adams testified at the habeas hearing that if he had had the result he "might have used it," but that he felt that it was not "real relevant." As we explained in Part 1, Rodriguez has not shown that the UA result was particularly material, or that it would have served to create a reasonable probability of a different result. Even if Adams was deficient in this regard, therefore, Rodriguez has not shown that he was prejudiced by counsel's performance. Rodriguez's credibility was so thoroughly impugned that showing he had a clean UA would not likely have made a difference in the outcome.

#### c. *Failure to remove jurors*

■■■ [¶ 32.] Rodriguez asserts that Adams should have removed three jurors with peremptory challenges, and that he failed to offer any reason during the habeas hearing for leaving them on the jury panel. He points to jurors Wayne Reynolds, Jennifer Bradley, and David Jewitt.

[¶ 33.] Juror Reynolds said during voir dire that he was bothered that Rodriguez lived in the United States yet used Spanish as his primary language. Reynolds was "firmly convinced" that a person who becomes a citizen should learn English. Juror Bradley was left on the jury even though her husband had just been hired as a reserve police officer in Spearfish. Ju-

ror Jewitt was an administrator of the Spearfish School District, and stated during voir dire that the prosecutor had worked with the Spearfish school on drug issues.

[¶ 34.] All three of these jurors, however, assured Adams that they could put these feelings and experiences aside and decide the case on the evidence presented. Reynolds answered "absolutely" when asked if he could "see past" his feelings on the use of the English language "and still judge this case on the facts." Bradley responded "no" when Adams asked whether her decision would be influenced by her husband's occupation, and answered affirmatively when asked if she could weigh the facts independent of her husband's job. Jewitt told Adams that his contact with the prosecutor was limited to asking him for his input on school policies. As did the other jurors in question, he indicated that he could decide this case based on the evidence presented, and that his contacts with the prosecutor would not interfere with his ability to hear the case.

[¶ 35.] Decisions on how to exercise peremptory challenges involve tactical choices, and claims of ineffective assistance of counsel are not established "by merely complaining about counsel's failure to challenge certain jurors or his failure to make proper objections." *Tsipouras v. State,* 567 N.W.2d 271, 276 (Minn.Ct.App.1997), *cert. denied,* 522 U.S. 1114, 118 S.Ct. 1049, 140 L.Ed.2d 113 (1998). Rodriguez has failed to sustain his burden of showing that Adams' performance was deficient, and therefore we need not decide whether he was prejudiced by the alleged failure. *See Stead v. United States,* 67 F.Supp.2d 1064, 1080 (D.S.D.1999)(citing *Strickland,* 466 U.S. at 697, 700, 104 S.Ct. at 2069, 2071, 80 L.Ed.2d at 699–700, 702; *Stokes v. Armontrout,* 851 F.2d 1085, 1092 (8thCir.1988)).

### d. *Failure to investigate or call potential witnesses*

[¶ 36.] Rodriguez next contends that Adams' performance fell below the *Strickland* standard when he failed to investigate or consider calling potential witnesses that could have confirmed the existence of Fernando Lara. Rodriguez was the only defense witness called at his criminal trial. He did not provide his counsel with information to help locate Lara, other than a business card from a restaurant in Chicago where he said he was supposed to meet Lara if they became separated during their cross-country trip. Yet, Rodriguez admitted that the only thing he knew about Lara was his name and that Lara was moving from California. The card had nothing noted on it about Lara; it was simply a printed restaurant business card. Furthermore, when the Lawrence County Sheriff's office contacted California law enforcement to get information on Lara, the California authorities could not find the name in their computer records.

[¶ 37.] Rodriguez said that when Adams asked him if he had any witnesses, he thought it was a "ridiculous question" because he felt his attorney was the one who was supposed to find witnesses. At the habeas hearing Adams testified, "We didn't ever make an attempt to try and find another witness, you know, to get one here, no." According to Rodriguez, his wife, his sister, and the owner of the Blazer could have been called as witnesses on his behalf. Rodriguez believed his sister could have testified that she had seen Lara pick him up at his parents' home. He was vague about what he felt the owner of the Blazer could have testified to, stating that "[w]ell, at least he could provide more information than I – than I do to try to locate the guy that I believe is this Fernando Arturo Lara, you know, because I believe he know more than I do about him, you know." None of these witnesses were called to testify at the habeas hearing, so we have only Rodriquez's speculation about what they would have said.

[¶ 38.] "Failure to call a witness will not automatically produce ineffec-

tive assistance of counsel." *Lodermeier*, 1996 SD 134, ¶ 20, 555 N.W.2d at 625 (citing *Garritsen*, 541 N.W.2d at 94). There must be a showing of prejudice that deprived the accused of a fair trial. *Sund*, 1998 SD 123, ¶ 21, 588 N.W.2d at 226 (citations omitted). Rodriguez must show how these witnesses would have changed the outcome of his trial. *Fast Horse v. Weber*, 1999 SD 97, ¶ 16, 598 N.W.2d 539, 544. Unlike the showing of prejudice in *Sund*, where potential witnesses testified at the petitioner's habeas hearing and thereby produced evidence of reasonable doubt on whether Sund had the requisite criminal intent, here only Rodriguez and attorney Adams testified at the habeas hearing. We find that Rodriguez has not met his burden of showing that counsel's errors were sufficiently serious and prejudicial to deprive him of a fair trial.

[¶ 39.] Affirmed.

[¶ 40.] MILLER, Chief Justice, and AMUNDSON and GILBERTSON, Justices, concur.

[¶ 41.] SABERS, Justice, concurs in result.

SABERS, Justice (concurring in result).

[¶ 42.] The majority finds that the actions, or more appropriately inactions, of trial counsel do not constitute deficient performance. I disagree. While there is a "strong presumption" in the law that trial counsel acted effectively, Rodriguez's trial counsel inexcusably managed to overcome the presumption afforded him. *See Sprik*, 1997 SD 134, ¶ 24, 572 N.W.2d at 829. His errors were "so serious that [he] was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. This conclusion is supported by the facts that:

1. The State's Attorney failed to timely disclose the negative results of the urinalysis test.

2. Trial counsel failed to pursue the *Brady* request that would have led to the discovery of the negative results of the urinalysis test.

3. Trial counsel failed to use the negative results of the urinalysis test to support Rodriguez's credibility.

4. Trial counsel failed to use the negative results of the urinalysis test to support Rodriguez's lack of knowledge on the possession charge.

5. Trial counsel failed to conduct an adequate investigation and search for potential witnesses.

[¶ 43.] However, Rodriguez must also establish that trial counsel's deficient performance "prejudiced the defense" and made the results of the proceeding fundamentally unfair or unreliable. *Rhines*, 2000 SD 19, ¶ 15, 608 N.W.2d at 307. Rodriguez has failed to meet this burden. In essence, Rodriguez gambled and consented to the search of the vehicle. His gamble failed and the drugs were found. Therefore, he can show no prejudice resulted from the deficient performance.

[¶ 44.] I agree that no prima facie showing of intentional discrimination has been made on the *Batson* issue. In view of the unanimous decision that a prima facie showing of intentional discrimination is lacking to establish an ineffective assistance of counsel claim under *Batson*, it is clearly unnecessary to address the prejudice prong of the ineffective assistance claim in that respect. We should save any such analysis of prejudice under *Batson* for another day.

[¶ 45.] Therefore, I concur in result only.